# STATE OF CONNECTICUT *v.* CARVAUGHN JOHNSON
## (SC 17267)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

Argued November 26, 2007—officially released August 5, 2008

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *Michael A. Pepper*, senior assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, and *Julia K. Conlin*, assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. A jury found the defendant, Carvaughn Johnson, guilty of murder in violation of General Statutes § 53a-54a (a),[1] and carrying a pistol without a permit in violation of General Statutes § 29-35.[2] The trial court rendered judgment in accordance with the verdict, and the defendant appealed to this court.[3] The defendant seeks a new trial on the basis of his claims that the trial court improperly (1) concluded that he had not proven actual prejudice resulting from the influence of courtroom spectators on the jury's deliberations and its assessment of the witnesses' credibility, (2) concluded that the New Haven police department did not violate his due process rights in failing to make a record of the entirety of its questioning of the state's key witness and improperly declined the defendant's request for an adverse inference instruction, (3) failed to disclose to the defendant the psychological records of the state's key witness and improperly restricted defense counsel's impeachment of that witness, and (4) charged the jury regarding consciousness of guilt and reasonable doubt. We have examined each of the claims, find no impropriety and, therefore, affirm the judgment of conviction.

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person without a permit to carry the same issued as provided in section 29-28. . . ."

[3] The trial court sentenced the defendant to a total effective term of forty-three years imprisonment.

On the basis of the evidence presented at the trial, the jury reasonably could have found the following facts. The defendant shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the defendant and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford, was sitting with the victim at the corner of Read and Shepard Streets when she observed the defendant approach.[4] The defendant walked toward Ford and the victim, called the victim "a punk," and threatened to assault him. The victim said nothing, and the defendant walked away.

The victim next encountered the defendant in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford[5] were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing near it, when the defendant stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the defendant that he had found the bicycle about one month earlier and had fixed it up. The victim told the defendant that he owned the bicycle. The defendant asked for the bicycle a second time, and, when the victim refused, the defendant said, "[d]on't make me do something to you." The defendant then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the defendant may have been

---

[4] The record reveals that the area of New Haven where most of the pertinent events occurred is called Newhallville and is a block-shaped area formed around the intersections of Read, Shepard, Huntington and Newhall Streets.

[5] L'Kaya Ford and Ralph Ford are not related.

carrying a gun.[6] The defendant then took the bicycle and rode away.

After this encounter, the victim, accompanied by Ralph Ford, returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the defendant and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the defendant approached the victim and L'Kaya Ford about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the defendant also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically remarked to her that he thought he might be going back to jail.

On the morning of October 10, the defendant approached L'Kaya Ford while she was waiting for a bus. The defendant, who was driving a black car that L'Kaya Ford described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The defendant insulted her, told her he did not like snitches and that she knew what happened to "snitches in the hood." That night, the victim, L'Kaya Ford, Ralph Ford, and other friends gathered on the corner of Read and Shepard Streets to celebrate L'Kaya Ford's birthday. Some of the group, but not Ralph Ford or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and Ralph Ford departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neigh-

---

[6] The victim told police investigating the incident that the defendant did not have a weapon. A witness, Dwana Wilson, however, saw the encounter from across the street and testified that she had witnessed the defendant holding a black handgun and pointing it at the victim.

borhood residents. On that night, however, Ralph Ford did not take his usual shortcut but parted from the victim, who took the shortcut home. Ralph Ford then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street.[7] Upon arriving at his house, Ralph Ford heard a gunshot coming from the backyard of the house across the street. Ralph Ford then entered his front hallway. Ralph Ford heard someone running from the yard across the street and saw the defendant run into the driveway leading to Ford's house.[8] Ralph Ford saw the defendant carrying a semiautomatic handgun and entering a black Acura as it exited the driveway.[9] James Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than Ralph Ford and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from "certain individuals" for contacting the police. Joanie Joyner, a resident of Huntington Street and the

[7] Ralph Ford did not explain why he did not remain with the victim and take the usual shortcut home that night, other than indicating that he liked to walk on Read Street.

[8] As we explain more fully in the text of this opinion, Ralph Ford, the state's key identification witness, recanted his testimony from the defendant's first trial at the defendant's retrial, but his prior inconsistent statements were used to impeach him at the second trial and admitted as substantive evidence pursuant to § 8-5 (1) of the Connecticut Code of Evidence. See, e.g., *State v. Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[9] At trial, Toles testified that, earlier that day, she had seen the defendant in a cranberry colored car that she believed was a Dodge Intrepid. The defendant was a passenger in the car and was accompanied by two other people.

victim's next-door neighbor, also heard a loud "boom" from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

The defendant contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The defendant did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk.[10] The defendant was with a friend, Travis Scott.[11] To enter the dormitory, the defendant was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the defendant into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The defendant and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Daryl Breland of the New Haven police department drove from Ralph Ford's house to Toles' dormitory, recorded the distance to be about

---

[10] There was conflicting testimony at trial about the clothes that the defendant was seen wearing on the night the victim was shot. Toles observed him around 11 p.m. wearing "[a] black T-shirt, some blue jeans, a black leather coat, and black Jordan sneakers." Ralph Ford's testimony from the defendant's first trial was read into evidence at the second trial, and he testified that, when he saw the defendant running across Huntington Street from the direction of the gunshot, the defendant was wearing blue jeans, a grey hooded sweatshirt with orange stripes on the sleeves, and black boots.

[11] Toles did not see what car, if any, the defendant and Scott arrived in that evening.

three miles and noted that the trip took approximately ten minutes.

Officers Mark Taylor and Brian Pazsak of the New Haven police department were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven fire department personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

Arkady Katsnelson of the chief medical examiner's office performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face.[12] Katsnelson concluded that the bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim. The defendant was charged with the victim's murder and related crimes on April 24, 2002, and subsequently was tried. After seven days of deliberations, the jury in the defendant's first trial was unable to reach a verdict. Therefore, the trial court, *Licari, J.*, declared a mistrial pursuant to

---

[12] The police, relying on information received and the identifications made by Ralph Ford and L'Kaya Ford, secured a search warrant for the defendant's residence and seized a .45 caliber handgun. Ballistics testing confirmed that the gun seized from the defendant's home was not the gun used to kill the victim. The parties stipulated at trial that there was no record of a permit in the defendant's name to carry a handgun. The police also seized a pair of black, high-top sneakers from the defendant's home but did not find a gray sweatshirt with orange stripes or blue jeans.

Practice Book § 42-45.[13] The present appeal arises from the second trial of the defendant in which the jury returned a verdict of guilty of the crimes of murder and carrying a pistol without a permit. Additional facts will be set forth as necessary in the context of the defendant's specific claims on appeal.

I

The defendant first claims that he was denied his right to a fair trial by an impartial jury in violation of the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution as a result of juror misconduct.[14] Specifically, the defendant claims that he was prejudiced by the jury's improper consideration of extrinsic evidence in assessing Ralph Ford's[15] credibility. According to the defendant, this extrinsic evidence consisted of the jurors' observations of certain courtroom spectators who were present on the day Ford testified and the conclusions that the jurors drew from the presence of those spectators. The defendant also contends that the trial court should have determined whether the jurors were improperly influenced by racial bias in response to these spectators. The state claims, in response, that the spectators' presence in the courtroom should not be deemed extrinsic evidence that the jury improperly had considered. The state claims, in the alternative, that, if this court determines that the jury's consideration of the presence of the spectators is misconduct, the trial court properly concluded that the defendant failed to meet his burden

[13] Practice Book § 42-45 provides: "The judicial authority shall declare a mistrial in any case in which the jury are unable to reach a verdict."

[14] Because the defendant does not present any independent state constitutional analysis of this particular claim, we confine our analysis to federal constitutional law. E.g., State v. Valentine, 240 Conn. 395, 405 n.12, 692 A.2d 727 (1997).

[15] In the interest of simplicity, we hereinafter refer to Ralph Ford by his last name.

of demonstrating actual prejudice. We agree with the state that the mere presence of spectators in a public courtroom and the jury's observation of them does not constitute juror misconduct or the consideration of extrinsic evidence. Further, we conclude that the trial court did not abuse its discretion in determining that the defendant had failed to demonstrate that he was denied a fair trial by an impartial jury.

We begin with the additional facts relevant to this claim. The defendant has maintained throughout this case that the state's evidence was weak and that he is innocent. Thus, because he was surprised by the jury's verdict, the defendant, through an investigator at the office of the public defender, requested feedback from some of the jurors. As a result of conversations with members of the jury, the investigator learned that some of the jurors appeared to have drawn their own conclusions regarding the presence of the spectators in the courtroom on the day Ford testified and that these observations may have been discussed during the jury's deliberations.

The defendant filed a motion seeking an evidentiary hearing, pursuant to *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995), to inquire into possible juror misconduct. The trial court, *Thompson, J.*, granted the defendant's motion and held an evidentiary hearing on May 6, 2004.[16] After conducting the evidentiary hearing and considering the arguments of counsel, the trial court issued a memorandum of decision denying the defendant's motion for a new trial. In its decision, the

---

[16] On that day, the trial court, *Thompson, J.*, questioned eleven of the twelve jurors. The hearing was continued for the purpose of completing the juror questioning on May 21, 2004.

The court questioned the jurors individually. Each juror was sworn in and instructed not to discuss the questions asked or their responses with anyone, including fellow jurors. The court essentially asked the same questions of each juror, and counsel for both parties agreed on the questions.

court observed that, "[s]ince . . . Ford was the only witness directly linking the defendant to the shooting, it is logical to conclude that the jury was called upon to determine whether . . . Ford was being truthful either when he gave his prior testimony and statements, when he testified at this trial or not at all."

The trial court then made the following findings of fact and conclusions: "During [Ford's] testimony . . . each of the twelve jurors observed a number of individuals on the defendant's side of the courtroom.[17] Six jurors testified that they drew no conclusions from the presence of those individuals. One juror concluded that they were there to watch . . . Ford, a second wondered if they were family members of the defendant or . . . Ford, a third believed that they were 'people from the neighborhood' [and that 'it seemed [that] they were altering the testimony of . . . Ford'], a fourth thought they were friends of the defendant [and '[m]aybe that . . . Ford was afraid, intimidated'], a fifth said he had

---

[17] The transcript of the two days of the hearing reveals the substance of the questions that were posed to the jurors:

(1) Did you observe individuals sitting in the spectator area of the courtroom on the defendant's side during Ford's testimony?

(2) Would you describe those individuals?

(3) Did you draw any conclusions regarding the presence of those individuals?

(4) What were those conclusions?

(5) Did you see those individuals in the courtroom at any other time during the trial?

(6) Was the presence of those individuals whom you observed and any conclusions about those individuals discussed among the jurors during deliberations or prior thereto?

(7) Can you tell me the extent of those discussions without getting into what was said? Was it a little bit, a lot, or somewhere in the middle?

(8) Did you observe Ford on the day that he testified during any court recess?

(9) If yes, what did you observe?

(10) To your knowledge, did any other juror or jurors observe Ford during any court recess?

(11) If so, was the subject of this observation discussed during deliberations and what was the extent of any such discussions?

no idea who they were but assumed that they were [t]here for the defendant, and a sixth wondered why they were there for only that one day.

"All but two of the jurors questioned testified that the presence of those individuals was discussed during deliberations. One juror recalled no discussions and a second recalled such discussions but not when they took place. No juror testified that any such discussions took place at a time other than during deliberations.

"The court also inquired of the jurors as to the extent of any such discussions. Two jurors stated that there were a lot of discussion[s], five jurors indicated that there [were] a [few] or minimal discussions and the rest stated that the extent of such discussions was in between a little and a lot.

"Some jurors either saw . . . Ford during a recess or were aware that another juror or jurors may have seen him, but those jurors testified that there was either no discussion concerning that subject matter or [that] any discussion was minimal.

"It is fair to conclude, therefore, that each of the jurors observed individuals seated in the courtroom on the defendant's side during [Ford's] testimony . . . and some drew the conclusions noted [previously]. There was some discussion of the presence of these individuals during deliberations, the extent of which is unclear." On the basis of these findings and conclusions, the trial court ultimately concluded that, although it was not convinced that the facts supported an allegation that the jury improperly had considered extrinsic evidence,[18] even if it was misconduct, the defendant did

---

[18] The trial court observed: "This is not a situation where a juror or jurors went outside the evidence to do research, conduct an experiment or visit a crime scene, [and there] has [not] been any improper communication to or by any juror. The jurors in this case observed what was there to be seen during the testimony of . . . Ford."

not meet his burden of proving actual prejudice because "there were a number of instances where . . . Ford's own testimony indicated that he was in fear of the defendant [and] his friends to the point where he moved from the neighborhood." Thus, "[w]hat impact, if any, such events or circumstances had upon the ultimate outcome of this case has not . . . been removed from the realm of speculation."

A

We first must decide whether the defendant's claim is properly viewed as juror misconduct because our case law requires certain actions by a trial court in response to allegations of juror misconduct that are not required, generally, for a defendant's claim that he has been denied a fair trial. See, e.g., *State* v. *Roman*, 262 Conn. 718, 726, 817 A.2d 100 (2003); *State* v. *Brown*, supra, 235 Conn. 526. As a preliminary matter, we note the settled principle that "[j]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 522–23. "The United States Supreme Court has noted, however, that the [c]onstitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (Internal quotation marks omitted.) *State* v. *Weinberg*, 215 Conn. 231, 249, 575 A.2d 1003, cert. denied, 498 U.S.

967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). "Were that the rule, few trials would be constitutionally acceptable." *Smith* v. *Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). We have recognized, moreover, that "[t]he trial court, which has a first-hand impression of [the] jury, is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant." (Internal quotation marks omitted.) *State* v. *Weinberg*, supra, 249.

In the present case, the defendant claims that the jurors' "[c]onsideration of the spectators' presence was consideration of a fact outside the evidence, no different than if jurors had done their own investigations and considered any other extraneous facts." The state disagrees and argues that the presence of spectators, "who are doing nothing other than being spectators," at a *public* trial is not extrinsic evidence. We agree with the state and conclude that the nature of the defendant's claim is not one of juror misconduct but, rather, more appropriately characterized as a claim that the courtroom environment or a courtroom situation improperly biased the jury.

In *Aillon* v. *State*, 168 Conn. 541, 363 A.2d 49 (1975), we observed that, as early as 1866, courts had recognized certain occurrences as being "irregularities and misconduct" of a jury such that evidence of such misconduct could be considered to challenge a verdict: "[A]ffidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, *as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or*

*other artifice or improper manner.*" (Emphasis added; internal quotation marks omitted.) Id., 550–51. Our case law further confirms that such occurrences are properly considered juror misconduct. See, e.g., *State* v. *Roman,* supra, 262 Conn. 727 (allegation that juror spoke with victim's family out of court treated as juror misconduct); *State* v. *Brown,* supra, 235 Conn. 519–21 (court received anonymous letter describing misconduct because jurors overheard sheriffs making racial remarks about defendant and discussing improper identification procedures used by detective who testified for state); *State* v. *Asherman,* 193 Conn. 695, 738–40, 478 A.2d 227 (1984) (misconduct for jurors to bring nonevidentiary material into jury room to conduct experiment testing defense counsel's theory of case), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); see also *State* v. *Harris,* 230 Conn. 347, 349, 644 A.2d 911 (1994) (*Berdon, J.,* dissenting) (misconduct for juror to conduct experiment outside of jury room to test theory of case and to report findings to other jurors). This case law also illustrates that juror misconduct occurs predominantly when jurors are exposed to information outside of the courtroom that may tend to affect deliberations and that cannot be observed by the trial judge or by counsel. In analyzing whether juror misconduct has prejudiced a defendant, we have observed that a defendant is prejudiced when "the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Internal quotation marks omitted.) *State* v. *Newsome,* 238 Conn. 588, 628, 682 A.2d 972 (1996).

Significantly, what we traditionally have recognized as juror misconduct is not the only potentially prejudicial influence that courts have addressed in responding to a defendant's claim that his trial was unfair. Another line of cases addresses the question of whether a *situation, arrangement or presence in the courtroom* during

the defendant's trial prejudiced him such that it biased the jury. See, e.g., *Holbrook* v. *Flynn*, 475 U.S. 560, 570–72, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (presence of uniformed officers seated behind defendant in courtroom may be prejudicial but must be considered on case-by-case basis and weighed against state's interest in security); *Estelle* v. *Williams*, 425 U.S. 501, 512–13, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976) (compelling prisoner to wear prison garb during trial deprives him of fair trial); *Woods* v. *Dugger*, 923 F.2d 1454, 1459 (11th Cir.) (totality of circumstances including overwhelming presence of uniformed prison guards as spectators in courtroom led court to conclude that case was one of those "extreme cases" in which defendant was prejudiced [internal quotation marks omitted]), cert. denied sub nom. *Singletary* v. *Woods*, 502 U.S. 953, 112 S. Ct. 407, 116 L. Ed. 2d 355 (1991); *Norris* v. *Risley*, 918 F.2d 828, 830 (9th Cir. 1990) (courtroom spectators wearing "women against rape" buttons created unacceptable risk that jury would consider "impermissible factors"), overruled in part by *Carey* v. *Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006); see also *State* v. *Atwood*, 171 Ariz. 576, 633, 832 P.2d 593 (1992) (defendant contended that courtroom presence and behavior of citizen action group during trial denied him fair trial), cert. denied, 506 U.S. 1084, 113 S. Ct. 1058, 122 L. Ed. 2d 364 (1993), overruled in part on other grounds by *State* v. *Nordstrom*, 200 Ariz. 229, 25 P.3d 717, cert. denied, 534 U.S. 1046, 122 S. Ct. 627, 151 L. Ed. 2d 548 (2001); *Overstreet* v. *State*, 877 N.E.2d 144, 157 (Ind. 2007) (allegation that courtroom spectators were wearing buttons depicting victim denied defendant fair trial); *State* v. *Lord*, 161 Wash. 2d 276, 278, 165 P.3d 1251 (2007) (allegation that buttons depicting victim and worn by spectators in courtroom denied defendant fair trial); cf. *State* v. *Higgins*, 265 Conn. 35, 78, 826 A.2d 1126 (2003) (presence of two uniformed officers seated

behind defendant did not prejudice him such that mistrial should have been granted). This line of cases addresses allegedly improper influences on the jury within the adversarial arena that have not been characterized as juror misconduct. Rather, these cases focus on whether the situation or atmosphere in the courtroom created inherent or actual prejudice to the defendant such that a new trial should be granted.

Undoubtedly, there is an area of overlap between these lines of cases as both are concerned with protecting the defendant's right to a fair trial by an impartial jury. There are distinctions between them, however. First, in *Brown*, on which the defendant and the trial court in the present case relied, we invoked our "inherent supervisory power" to conclude that "a trial court *must conduct* a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel." (Emphasis added.) *State* v. *Brown*, supra, 235 Conn. 526; see also *State* v. *Roman*, supra, 262 Conn. 726. Although *Brown* left the scope of the inquiry to the sound discretion of the trial courts, it created a mandate that courts conduct an inquiry on the record with counsel present whenever an allegation of juror misconduct comes to light. In adopting this rule, we recognized that "the jury room cannot be guarded with too much vigilance and jealousy. Courts must reject all evidence not received on the trial, and must repel every foreign influence, which may affect the minds of the jury." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 527.

This court never has invoked *Brown* in a case involving an allegation that spectators in the courtroom or the courtroom atmosphere itself rendered the trial unfair. In *Higgins*, which was decided after *Brown*, we addressed a claim that the presence of two uniformed officers seated in the spectator section of the courtroom

behind the defendant prejudiced the jury. See *State* v. *Higgins*, supra, 265 Conn. 75–78. We did not apply *Brown* or analyze the case as one involving juror misconduct. Rather, we applied the inherent versus actual prejudice analysis used in cases of potential bias arising from the courtroom environment. See id., 76–77. In *Weinberg*, which was decided before *Brown* but which is the only case in which we have addressed the potentially prejudicial impact of spectator presence or behavior during a trial, we applied an abuse of discretion standard in determining whether the trial court properly denied a claim that the trial was unfair. See *State* v. *Weinberg*, supra, 215 Conn. 248–50. We observed that the determination as to the best response to such a claim should be left to the trial court's "wide discretion . . . ." Id., 249.[19] We note that there is a fundamental difference between the potential prejudice created by traditional juror misconduct and that created by the courtroom environment. A courtroom environment that is challenged as prejudicial involves situations or events that occur under the watchful gaze of the presiding judge and in the presence of counsel for the state and the defendant, whereas claims of juror misconduct deal with allegations that something unobservable or hidden potentially has tainted the unbiased nature of the jury. Generally, juror misconduct claims involve actions that occur beyond the courtroom.[20] See, e.g., *State* v. *Brown*,

---

[19] We note that, in *Weinberg*, we relied in part on juror misconduct cases. We, however, did not characterize a claim of prejudicial spectator behavior as juror misconduct. See generally *State* v. *Weinberg*, supra, 215 Conn. 248–50. We observed that a trial court is in the best position to judge what impact, if any, the spectators' actions in the courtroom had on the jury. See id., 249.

[20] We recognize that juror misconduct potentially can occur in the courtroom and even during trial, for example, when a court officer whispers something to a juror about the case or shares information with the juror about a witness. We note, however, the inherent difference between this type of communication that may bias a juror and a claim that the courtroom environment itself is unfair.

supra, 235 Conn. 526 (trial judge must conduct inquiry to determine whether jurors have been exposed to prejudicial information outside of courtroom); cf. *State* v. *Weinberg*, supra, 249 (trial court has firsthand impression of jury during proceeding and is in best position to evaluate whether jurors have been prejudiced by courtroom spectators' outburst or conduct). Because of this fundamental difference, we conclude that it is appropriate for trial courts to have wide discretion in responding to allegations that the courtroom environment resulted in an unfair trial, which are unfettered by the mandate in *Brown*.

Second, we have concluded that certain allegations of juror misconduct may shift the burden to demonstrate prejudice away from the defendant. Allegations of juror misconduct in which the trial court is directly implicated shift the burden to the state to demonstrate that the misconduct did not harm the defendant, and away from the defendant, who ordinarily would be required to demonstrate actual prejudice. *State* v. *Newsome*, supra, 238 Conn. 628. Additionally, we have observed that allegations that a juror or jurors considered extrinsic evidence have been deemed presumptively prejudicial for purposes of determining the type and scope of the inquiry that a trial court must conduct, and when such claims are based on specific factual allegations, they may require a full evidentiary hearing to afford the defendant an opportunity to demonstrate actual prejudice. See *State* v. *Rhodes*, 248 Conn. 39, 48–49 and n.16, 726 A.2d 513 (1999). In contrast, a defendant who claims that a courtroom situation or environment rendered the jury incapable of being impartial has the burden of demonstrating either that the environment was inherently prejudicial or, in the alternative, that it caused actual prejudice. See, e.g., *Holbrook* v. *Flynn*, supra, 475 U.S. 570–72; *State* v. *Higgins*, supra, 265 Conn. 76–77.

In the present case, the defendant claims that the jurors were improperly biased against him as a result of their observation of spectators sitting on the defendant's side of the courtroom during Ford's testimony.[21] The defendant's theory of prejudice is premised on the belief that the conclusions that the jurors drew from the presence of those spectators improperly encouraged the jury to disregard Ford's recanted testimony that was introduced at the defendant's second trial and to credit Ford's earlier identification of the defendant as the shooter. The defendant characterizes this claim as one alleging juror misconduct involving the consideration of extrinsic evidence; however, he relies heavily on the separate line of cases, previously discussed, that do not engage in an analysis of "juror misconduct" but, rather, analyze claims of prejudicial courtroom environment and spectator influence by looking at whether there was inherent or actual prejudice. Furthermore, we note that, during oral argument before this court, the defendant's appellate counsel conceded that "what was really" at issue was an "improper influence" rather than the jurors' "violati[on] [of] a specific" rule, for example, by going to the crime scene or by conducting an independent investigation of the case. We conclude that the defendant's claim is more properly viewed as challenging the courtroom environment due to the presence of spectators rather than alleging juror miscon-

[21] We acknowledge that the defendant also raised concerns about observations that some jurors made of Ford outside of the courtroom during a court recess. The record, however, reveals nothing to suggest that any juror interacted with Ford, or was exposed to any extrinsic facts that could be considered extrinsic evidence or juror misconduct. Even if we assume that such interaction with a witness constitutes potential misconduct, the trial court conducted a full evidentiary hearing pursuant to *Brown* and concluded that there was no prejudice to the defendant. Any opinion of Ford was entirely speculative, and the trial court found that there was no or minimal discussion of the out-of-courtroom observations during deliberations. Nothing in the record remotely suggests that these out-of-courtroom observations resulted in a juror's closed mind. We agree with the trial court's assessment.

duct.[22] See *People* v. *Cornwell*, 37 Cal. 4th 50, 88 n.9, 117 P.3d 622, 33 Cal. Rptr. 3d 1 (2005) ("[The] [d]efendant's attempt to characterize the issue [of improper spectator behavior] as one involving jury misconduct giving rise to a presumption of prejudice is unavailing. There is no indication of misconduct by any juror."), cert. denied, 546 U.S. 1216, 126 S. Ct. 1432, 164 L. Ed. 2d 135 (2006); see also *People* v. *Houston*, 130 Cal. App. 4th 279, 319–20, 29 Cal. Rptr. 3d 818 (2005) (distinguishing law that applies to claims of spectator misconduct influencing jury from law that applies to claims of juror misconduct), review denied, No. S135593, 2005 Cal. LEXIS 10344 (September 21, 2005).[23] We next address whether the defendant was entitled to a new trial.

The appropriate standard of review is well settled. When, as in the present case, "the impartiality of the jury was challenged by a motion for mistrial [or a new trial], the trial court's determination will be reversed

---

[22] As we explain more fully in the text of this opinion, we view the defendant's claim to be that the presence of the spectators during Ford's testimony led the jury to conclude improperly that those spectators were associated with the defendant and were present to influence Ford's testimony. We note, however, that the defendant also calls attention to the fact that the record reveals some evidence that certain jurors commented on their observations of those spectators to other jurors during deliberations. To the extent that the defendant bases his claim that he received an unfair trial on these comments, it may be summarily rejected. In *State* v. *McCall*, 187 Conn. 73, 444 A.2d 896 (1982), we concluded that a juror's "[m]ere expression of opinion, as opposed to positive expression of facts [to other jurors during deliberations], does not warrant a mistrial" and does not constitute the consideration of extrinsic evidence. Id., 81. In the present case, any comments that the jurors made about the spectators were based entirely on speculation and conjecture. The record reveals nothing to suggest that any juror was exposed to *actual knowledge* as to the identity of the spectators in the courtroom or their relationship to the defendant or to Ford.

[23] Because we conclude that the nature of the defendant's claim is not one of juror misconduct but one alleging that the courtroom situation deprived him of a fair trial, we need not address the defendant's claims concerning whether it is appropriate to require a defendant to shoulder the burden of demonstrating prejudice in cases involving allegations of juror misconduct.

only where it can fairly be said that it abused its discretion in denying the mistrial [or new trial]. . . . In noting that a trial court has wide discretion . . . [t]he general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated." (Citations omitted; internal quotation marks omitted.) *State* v. *Weinberg*, supra, 215 Conn. 249–50; see also *State* v. *Rasmussen*, 225 Conn. 55, 86–88, 621 A.2d 728 (1993) (applying same standard to claim that juror's pending vacation plans caused jury to feel rushed to reach verdict, thereby prejudicing defendant). When a defendant seeks a new trial on the basis of juror bias, whether the result of juror misconduct or a prejudicial courtroom situation, to prevail on such a claim, he must "raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 436, 773 A.2d 287 (2001).

The United States Supreme Court has addressed the issue of whether a courtroom situation is inherently or actually prejudicial only with respect to state-sponsored conduct. See *Holbrook* v. *Flynn*, supra, 475 U.S. 570–72; *Estelle* v. *Williams*, supra, 425 U.S. 512–13. In *Holbrook* and *Estelle*, the United States Supreme Court held that a courtroom situation is inherently prejudicial when there is "an unacceptable risk . . . of impermissible factors coming into play" thus, violating the defendant's sixth amendment right to have his guilt determined by an impartial jury on the basis of the evidence presented. (Internal quotation marks omitted.) *Holbrook* v. *Flynn*, supra, 570; accord *Estelle* v. *Williams*, supra, 505. In *Holbrook*, the court further explained, however, that a determination that a situation in a courtroom is not inherently prejudicial does not end the analysis. If the defendant can demonstrate that the influence *actually*

prejudiced the jury, then a constitutional violation has occurred. *Holbrook* v. *Flynn*, supra, 572. Federal and state courts have applied this inherent or actual prejudice analysis to claims that private actor or spectator conduct during a trial rendered the proceedings unfair. See, e.g., *Woods* v. *Dugger*, supra, 923 F.2d 1457; *Norris* v. *Risley*, supra, 918 F.2d 830; *State* v. *Atwood*, 171 Ariz. 633; *Overstreet* v. *State*, supra, 877 N.E.2d 158; *State* v. *Lord*, supra, 161 Wash. 2d 287–88. We note that, recently, in *Carey* v. *Musladin*, supra, 549 U.S. 75–77, the United States Supreme Court suggested that this two step inherent or actual prejudice inquiry is limited to situations that result from *state-sponsored* conduct. Thus, the court's decision in *Carey* suggests that when a defendant moves for a mistrial or a new trial because he claims *private* conduct in the courtroom deprived him of a fair trial, he may be required to show actual prejudice. See id. Regardless of whether private conduct inside the courtroom ever can be deemed inherently prejudicial to a defendant, we conclude that the defendant in the present case has not shown inherent *or* actual prejudice. See *State* v. *Lord*, supra, 287, 290 (noting that Supreme Court has not applied inherent or actual prejudice inquiry to spectators wearing buttons but applying test and concluding that it was not per se inherently prejudicial); see also *State* v. *Paige*, 375 S.C. 643, 649, 654 S.E.2d 300 (App. 2007) (even if state supreme court would apply inherent or actual prejudice test to claim that courtroom spectators biased jury, defendant failed to show either).

Our research reveals no Connecticut authority, nor has the defendant cited any, that suggests that the mere presence of spectators in a public courtroom, without more, is inherently prejudicial. The constitution protects not only the defendant's right to a fair trial by an impartial jury but also the right of the defendant and the public to have open courtrooms. The United States

Supreme Court has recognized the importance of public courtrooms, especially in the context of criminal trials, and has observed that "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process . . . ." *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 606, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982). We conclude that mere spectator attendance at a public trial is expected and cannot, without more, create an "unacceptable risk of impermissible factors coming into play." (Internal quotation marks omitted.) *Holbrook* v. *Flynn*, supra, 475 U.S. 570; cf. *State* v. *McClure*, 184 W. Va. 418, 427, 400 S.E.2d 853 (1990) (court stressed need to consider importance of open and public courtroom in resolving claim of improper spectator influence).

In the present case, the defendant does not allege any conduct by the spectators that caused prejudice beyond their mere presence on the defendant's side of the courtroom. Cf. *Carey* v. *Musladin*, supra, 549 U.S. 72 (spectators wore buttons portraying murder victim throughout defendant's trial and in view of jury); *State* v. *Weinberg*, supra, 215 Conn. 247 (spectators gestured, uttered words and expressed disagreement during defense counsel's closing argument). Therefore, to support a finding of inherent prejudice, the defendant must show that the presence of the spectators for only a single day of the trial and their location on the defendant's side of the courtroom created an unacceptable risk of impermissible factors impacting the jury. The defendant does not allege that the spectators misbehaved or in any way should have come to the attention of the trial court or counsel. In *Estelle* v. *Williams*, supra, 425 U.S. 508–10, the United States Supreme Court observed that a defendant must show that he was *compelled* to wear prison garments during his trial and that he objected to wearing them in order to later claim that his attire deprived him of his right to trial by an impartial

jury. The court noted that the reason for the "focus [on] compulsion is simple . . . ." Id., 508. Because "instances frequently arise where a defendant *prefers* to stand trial before his peers in prison garments . . . it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." (Emphasis added.) Id. Likewise, we note that, often times, it will be a defense tactic to have members of the defendant's family, coworkers or the community attend the defendant's trial to demonstrate community support or otherwise imply his innocence. We conclude that if spectator presence and location in the courtroom appear potentially prejudicial, the defendant must object and give the trial court an opportunity to cure any possible prejudice, perhaps, by ordering a rearrangement of the spectators or by instructing the jury to disregard their presence. To require otherwise would be to permit the defendant to encourage spectator attendance during the trial in the hopes of increasing the likelihood of his acquittal and to use the fact of their presence later to attempt to impeach a guilty verdict. In the present case, the defendant never objected to the spectators during the trial and cannot now claim that their presence was inherently prejudicial.

We next address whether the defendant met his burden of demonstrating actual prejudice. We must begin by noting the significance of the fact that the defendant raised this claim for the first time *after* the jury returned its verdict. If a defendant raises the allegedly prejudicial condition *during* the trial, the court may be able to cure any prejudice by dismissing a juror, instructing the jury accordingly, or ordering spectators to refrain from certain conduct or to sit randomly in the courtroom gallery. See, e.g., *State* v. *Weinberg*, supra, 215 Conn. 250 (following spectator outburst, court instructed jury to disregard spectators and permitted defense counsel to reargue). If a defendant first objects

to the courtroom environment after the jury has returned its verdict, however, the only potential remedy available to the trial court is to grant a new trial. Additionally, we must recognize that, once the jury has returned its verdict, the defendant's claim that he has been denied a fair trial necessarily involves an attempt to impeach that verdict. Thus, if the trial court, in its discretion, determines that it is necessary to conduct some form of inquiry, it is greatly limited as to the type of inquiry that it may conduct to ascertain the impact, if any, of the courtroom environment on the jurors.

We have recognized that, "[a]lthough both the state and a criminal defendant have an interest in impartial jury trials . . . after a jury verdict has been accepted, other state interests emerge that favor proceedings limited in form and scope. The state has a strong interest in the finality of judgments . . . and in protecting the privacy and integrity of jury deliberations, preventing juror harassment and maintaining public confidence in the jury system." (Citations omitted.) *State* v. *Brown*, supra, 235 Conn. 531. Additionally, when a defendant claims that the courtroom environment deprived him of his right to an impartial jury after a verdict has been reached, he implicates the well settled limitation on inquiring into the mental processes of jurors.[24] See Practice Book § 42-33 ("no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined").

In *State* v. *Castonguay*, 194 Conn. 416, 436–37, 481 A.2d 56 (1984), we described the permissible scope of a trial court's postverdict juror inquiry in response to

---

[24] We note that these limitations apply to *any* postverdict inquiry that involves questioning jurors and is not limited to responses to allegations of a prejudicial courtroom environment.

a claim that the court improperly instructed the jury that it could discuss the evidence prior to its deliberations. Although the precise nature of the claim in *Castonguay* was not the same as in the present case, we find the discussion instructive, generally, for understanding the practical limitations imposed by our prohibition on postverdict inquiry into jurors' mental processes.[25] In *Castonguay*, we explained that any postverdict inquiry of jurors must be narrow. Id., 437. We further observed that the trial court is prohibited from "[a]ny inquiry into . . . the *impact*" of the situation on the jury. (Emphasis added.) Id.

Thus, a trial court may inquire about whether members of the jury observed the situation, whether they discussed it during deliberations, and whether they, as individuals, arrived at a fixed opinion as to the situation such that they were unable to deliberate with open and impartial minds. See id. Beyond that, however, as we recognized in *Aillon* v. *State*, supra, 168 Conn. 551, a court may not tread. A court may not inquire as to "[e]vidence of the *actual effect of the extraneous matter upon jurors' minds*" because "such evidence implicates their mental processes . . . ." (Emphasis added; internal quotation marks omitted.) Id. We conclude that, once a verdict has been reached, the proper inquiry does not involve a determination of what conclusions the jurors *actually* drew but, rather, of whether the

---

[25] We recognize that our discussion in *Castonguay* was provided as guidance for the trial court on remand. See *State* v. *Castonguay*, supra, 194 Conn. 436. In that case, we acknowledged that, because both parties conceded that the instruction to the jury was improper as a matter of law, the trial court had abused its discretion in not conducting a further inquiry as to the harm that may have resulted to the defendant. See id., 434. We expressly rejected the defendant's claim that it reasonably could be assumed that the jurors did engage in some discussion of the evidence prior to deliberations and that he, therefore, was entitled to a new trial. Id., 434, 436. We note that, because *Castonguay* involved potential prejudice *caused by the court*, the burden was on the state to demonstrate lack of prejudice, rather than on the defendant to demonstrate prejudice, as in the present case.

jurors were aware of or actually exposed to the court-room situation, whether it affected their ability to be impartial and whether it was of "such a nature that it *probably* rendered the juror[s] unfair or partial."[26] (Emphasis added; internal quotation marks omitted.)

[26] We recognize that this objective inquiry into actual prejudice, which is proper for a postverdict claim, is similar in nature to the test for inherent prejudice articulated by the United States Supreme Court. See, e.g., *Holbrook* v. *Flynn*, supra, 475 U.S. 570. Several considerations counsel in favor of this parallel. First, in addressing the potential prejudice of spectator conduct, as the United States Supreme Court has noted, we are not concerned with *state-sponsored* conduct that a jury runs the risk of viewing with additional weight or authority or that is likely to prompt an inference that the state has come to a conclusion as to the defendant's guilt. Second, we must balance the importance of open and public courtrooms with the potential influence that the public's presence may have on the jury. Third, when a defendant fails to object during the trial, and the challenged spectator influence was not observable to the court and was an influence clearly in need of remediation, the trial court is deprived of an opportunity to craft a remedy—e.g., a curative instruction, admonishing the spectators, or ordering them to leave the courtroom—short of vitiating the entire proceedings. We note, however, that the two inquiries are not identical. The inherent prejudice inquiry focuses on whether the challenged situation or environment creates an "unacceptable risk . . . ." *Holbrook* v. *Flynn*, supra, 570. Our postverdict analysis of whether the defendant has demonstrated actual prejudice looks at whether the jury was *actually* aware of the challenged situation and then assesses the *probability* of prejudice in light of the nature of the challenged courtroom scheme.

Finally, we emphasize that we do not anticipate many *postverdict* claims that challenge the potential prejudice stemming from the influence of courtroom spectators because, as our case law and that of other jurisdictions suggest, a courtroom environment that deprives a defendant of his right to a fair trial is likely to come to the court's attention and be addressed long before the jury reaches a verdict. See, e.g., *Carey* v. *Musladin*, supra, 549 U.S. 72 (defense counsel raised objection *during trial* to spectators' wearing buttons portraying victim); *State* v. *Higgins*, supra, 265 Conn. 73–78 (trial court did not abuse discretion in denying motion for mistrial after inquiring into potential prejudice resulting from presence of uniformed officers in courtroom by questioning jurors *before deliberations*, and excusing one juror who appeared to be unable to be impartial); *State* v. *Weinberg*, supra, 215 Conn. 246–47 (defense counsel moved for mistrial after spectators gestured and mocked him during closing argument, prompting court to give multiple cautionary instructions and to permit defense counsel another opportunity to present argument *before deliberations*); see also *People* v. *Cornwell*, supra, 37 Cal. 4th 87 ("Although spectator misconduct constitutes

*State* v. *Castonguay*, supra, 194 Conn. 437. We further emphasize that "[t]he trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of [spectator or other courtroom influence], and its prejudicial nature . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Weinberg*, supra, 215 Conn. 250–51.

We note that the trial court in the present case was not required to conduct a *Brown* inquiry. The trial court elected to, however, and we conclude that the court's inquiry improperly invaded the mental processes of the jurors. As we previously discussed, it was proper for the trial court to ask the jurors whether they observed the spectators on the defendant's side of the courtroom and whether they discussed their observations during deliberations. Furthermore, we conclude that it would have been proper for the trial court to inquire as to whether the jurors drew fixed opinions about the spectators that impeded their ability to approach deliberations with a fair and open mind. The trial court asked the jurors, however, whether they drew any conclusions regarding the presence of those individuals and *what those conclusions were.* See footnote 17 of this opinion.

---

a ground for a new trial if the misconduct is of such a character as to prejudice the defendant or influence the verdict, the trial court must be accorded broad discretion in evaluating the effect of claimed spectator misconduct. . . . The reason is obvious: *the court ordinarily is present in the courtroom at any time when a spectator engages in an outburst or other misconduct in the jury's presence and is in the best position to evaluate the impact of such conduct on the fairness of the trial.*" [Citation omitted; emphasis added; internal quotation marks omitted.]); *People* v. *Smith*, 253 Ill. App. 3d 443, 453, 624 N.E.2d 836 (1993) (juror brought conduct of spectator to trial court's attention prior to deliberations); *State* v. *McClure*, supra, 184 W. Va. 427 ("[t]here are valid reasons for the conduct of an open trial and, given the record . . . the [c]ourt does not believe that the defendant can establish that the victim's conduct was of such an *overt, outrageous, and inflammatory character to warrant the conclusion that the jury was influenced by what occurred* or that the trial judge abused his discretion by refusing to declare a mistrial" [emphasis added]).

This inquiry into the specific conclusions that the jurors drew about the presence of spectators amounted to an inquiry into *the actual effect* of the spectators' presence on the jurors' minds and was improper. The trial court should have considered whether the mere presence of spectators on the defendant's side of the courtroom on the day of Ford's testimony created a situation "of such a nature that it probably rendered the juror[s] unfair or partial." (Internal quotation marks omitted.) *State* v. *Castonguay*, supra, 194 Conn. 437. Because the trial court posed improper questions, however, we are presented with knowledge of the jurors' mental processes to which we otherwise would not have access. Therefore, we are compelled to address whether the conclusions that the jurors drew demonstrate that they were biased.

Our law is well settled that it is a jury's duty to determine the credibility of witnesses and to do so by observing firsthand their conduct, demeanor and attitude. See, e.g., *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005). Some of our older cases indicate that fact finders properly may consider not only a witness' demeanor during his testimony but also his spontaneous reactions in the courtroom, as a whole, provided these considerations are limited to assessing credibility. See *Kovacs* v. *Szentes*, 130 Conn. 229, 233, 33 A.2d 124 (1943); *State* v. *McLaughlin*, 126 Conn. 257, 264–65, 10 A.2d 758 (1939). A jury's assessment of a witness' credibility also naturally and rightly may include observations of his reaction to having to confront the defendant physically and to testify in an open and public forum. See *State* v. *Jarzbek*, 204 Conn. 683, 692–93, 529 A.2d 1245 (1987) (confrontation clause "finds its modern justification in the perceived role that physical confrontation plays in the truth-seeking process"), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). We have observed that the

confrontation clause was conceived as a means of providing the accused with "an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of *compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.*" (Emphasis added; internal quotation marks omitted.) Id., 692. Therefore, we conclude that, to the extent that the jurors formed opinions as to Ford's credibility by observing *his demeanor* on the stand and *his* spontaneous reactions in the courtroom, they acted properly. Such observations and the rational inferences drawn therefrom are not prejudicial. See S*tate* v. *Porter*, 241 Conn. 57, 120, 698 A.2d 739 (1997) ("forming impressions and intuitions regarding witnesses is the quintessential jury function"), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

Furthermore, with respect to the conclusions drawn by the jurors about the presence of the spectators, we conclude that the defendant has failed to "raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State* v. *Anderson*, supra, 255 Conn. 436. In *Higgins*, we noted that one of the reasons the presence of uniformed officers in the spectator section of the courtroom was not deemed inherently prejudicial was because of "the wider range of inferences that a juror might reasonably draw from the officers' presence." (Internal quotation marks omitted.) *State* v. *Higgins*, supra, 265 Conn. 76. Furthermore, in *State* v. *Cubano*, 203 Conn. 81, 523 A.2d 495 (1987), we observed that it would be an abuse of discretion to refuse to dismiss a juror only when "a juror has indicated a refusal to consider testimony and displayed evidence of a closed mind concerning [the] defendant's innocence . . . ."[27] (Internal quotation

[27] In *Cubano*, we reviewed a defendant's claim that the trial court improperly denied his motion for a mistrial when a juror informed the court that

marks omitted.) Id., 91–92. We conclude that there must be a similar indication that jurors were incapable of approaching their deliberations with fair and open minds to warrant a new trial under the circumstances of the present case. In this case, as in *Higgins*, we recognize a plethora of potential inferences that the jury could have drawn. See *State* v. *Higgins*, supra, 76. We know from the trial court's inquiry that not all of the jurors testified to drawing any conclusions, none of the jurors drew the same inferences from the presence of the spectators, and it is clear from the jurors' testimony that the conclusions that they drew were not certain or fixed. Rather, the testimony of the two jurors that is most indicative of any possible prejudice includes statements that "it *seemed* [that the spectators] were altering [Ford's] testimony" and "[*m*]*aybe* that . . . Ford was afraid, intimidated." (Emphasis added; internal quotation marks omitted.) Therefore, we conclude that the trial court correctly found that the defendant had failed to establish actual prejudice, and its denial of his motion for a new trial was not an abuse of discretion.

B

The defendant claims, in the alternative, that, if we agree with the state that the influence of the presence

she had recognized a family friend in the spectator section of the courtroom behind the defendant and was "shocked" to learn that, based on her observations, the defendant could have been a friend of her acquaintance. *State* v. *Cubano*, supra, 203 Conn. 84. We did not recognize this situation as one involving juror misconduct but, rather, assessed whether the defendant had established actual prejudice. Id., 90–92. We concluded that the juror's statements did not suggest a fixed opinion as to the defendant's guilt, that the court found the juror could approach her deliberations with an open mind, and that the defendant had relinquished the opportunity to question the juror further to establish bias. Id., 90–91. After concluding the trial court's decision was not an abuse of discretion, however, we then assumed, arguendo, that it was "juror misconduct" and recognized that, even if it was juror misconduct, it would not automatically require a new trial. Id., 91.

of the spectators on the jury did not prejudice the defendant, we must remand the case to the trial court for an evidentiary hearing on whether the race of the spectators prejudiced the jury. This claim is without merit. In support of this claim, the defendant asserts that the trial court "failed to inquire sufficiently to determine if any juror inferred from the spectators' race that they were present to intimidate Ford." Specifically, the defendant claims that, "[s]ince so many jurors noted the race of the spectators, the court had a duty to determine whether the influence of racism even subtly affected any conclusion that their purpose was intimidation . . . and thus that racism affected the verdict." In response, the state argues that this claim should be "summarily rejected" because "there was no evidence of racial bias before the trial court to trigger further inquiry," and the jurors who mentioned race "offered this information when asked to describe the spectators . . . ."

In *State* v. *Santiago*, 245 Conn. 301, 340, 715 A.2d 1 (1998), we exercised our supervisory authority to expand the scope of the inquiry required by *Brown* for general allegations of juror misconduct when the alleged misconduct results from the racial bias of a juror or jurors. In reaching this conclusion, we noted that "[p]rejudice negates the defendant's right to be tried on the evidence in the case and not on extraneous issues. . . . [Moreover] . . . the introduction of racial prejudice into a trial helps further embed the already too deep impression in public consciousness that there are two standards of justice in the United States, one for whites and the other for [minorities]." (Internal quotation marks omitted.) Id., 335. We determined that, "in all future cases in which a defendant alleges that a juror has made racial epithets . . . the trial court should conduct a more extensive inquiry . . . ." Id., 340.

Although we concluded in part I A of this opinion that the defendant did not allege juror misconduct and that the trial court, therefore, was not required to conduct a *Brown* inquiry, the court nevertheless did conduct such an inquiry. We conclude, however, that the resulting record reveals nothing to suggest racial bias on the part of any juror that would come within the purview of *Santiago* or otherwise require the trial court to investigate further. The only mention of race by the jurors occurred when they responded directly to the trial court's question, "Can you describe the spectators?" When asked to describe the spectators, seven of the twelve jurors did note that the individuals were "African-American" or "black."[28] We find it significant, however, that five of these seven jurors first mentioned the gender or height of the individuals rather than their race. In *State* v. *Merriam*, 264 Conn. 617, 835 A.2d 895 (2003), we concluded that a trial court did not abuse its discretion when it excused a juror who had been heard to make "off-color," racially based remarks; id., 676; but refused a request by the defense to poll the entire jury on the basis of the comments of the excused juror. Id., 676–77. In that case, we concluded that the "highly speculative nature of the defendant's claim and the absence of any demonstrable prejudice . . . provided no appreciable support for the defendant's claim." Id., 678. The defendant's argument in the present case rests on even less support than that of the defendant in *Merriam*, who was armed with *some evidence* of a juror's racial bias. Acceptance of the defendant's position in the present case would require trial courts to conduct *Santiago* inquiries on the basis of *the mere presence* of courtroom spectators who appear to be members of a minority population or certain ethnicity,

---

[28] One juror's initial response to the question did not include a description of race, but, in response to the trial court's inquiry about race, the juror recalled that the individuals being discussed were black.

without more. We acknowledge, unfortunately, that the rationale that this court relied on in *Santiago*, namely, that "[t]he intransigent nature of racial prejudice in our society is an unfortunate truth"; *State* v. *Santiago*, supra, 245 Conn. 335; still exists and is one from which the judicial system is not exempt. We decline the defendant's invitation to apply *Santiago* to the facts of the present case, as we conclude that to do so would demand an overly cynical and unjustified assessment of the jurors.[29]

## II

The defendant next claims that the trial court improperly denied his motion to dismiss on the ground that the police department had failed to preserve the methods by which they interrogated Ford and, thus, violated the defendant's due process rights under the state and federal constitutions.[30] Further, the defendant claims that the trial court improperly denied his request for an adverse inference instruction as an alternative remedy for this alleged due process violation. In response, the state contends that the trial court properly declined to dismiss the charges because it correctly recognized the distinction between allegations that the police had failed to *preserve* exculpatory evidence and allegations that the police had failed to *create* evidence that might have been exculpatory. The state further argues that

[29] We further note that the defendant never raised the issue of racial prejudice in the trial court. Although the defendant is correct that *Santiago* places a duty on a trial court to make an inquiry into race-based allegations regardless of whether counsel requests it, "[t]he defendant's failure to make such a request . . . suggests that, at the time of trial, he did not believe that . . . [such an inquiry] was necessary under the circumstances." *State* v. *Merriam*, supra, 264 Conn. 676 n.48.

[30] The basis of the defendant's due process claim is the lack of any record documenting the interrogation methods that the police used or the content of their discussions with Ford from a preinterview with him on the night of the shooting, prior to his audiotaped statement, and another similar preinterview period on October 12, 2001.

the trial court correctly declined to give the adverse inference instruction because it was not appropriate under the facts of this case, and because the court adequately instructed the jury that it could consider, in assessing Ford's credibility, both his prior inconsistent testimony from the defendant's first trial, as well as the failure, if it so found, of the police to record exculpatory information. We agree with the state.

The following additional facts and procedural history are relevant to our resolution of these claims. As we previously noted, Ford was the state's key witness and the source of the only evidence that the defendant was seen running from the direction of the crime scene on the night of October 10, 2001. Ford's testimony was complicated by the fact that his version of the events changed multiple times from his first interaction with the New Haven police on the night of the shooting to his in-court testimony at the defendant's second trial.

It is undisputed that Ford initially told the police that he knew nothing about the shooting and had seen nothing unusual after leaving the victim's company.[31] After hours of questioning, which the police character-ized as a "preinterview," Ford identified a photograph of the defendant from an eight photograph array and told the police that he had seen the defendant running away from the crime scene and getting into a black Acura parked in Ford's driveway. In his first statement, Ford denied seeing a gun. The record reveals that, up until this point, the police made no recording of their conversation with Ford and did not take any notes during the discussion. After Ford identified the defen-

---

[31] Ford came to the attention ot the police during a canvass of the neighbor-hood through which they learned from LaMont Wilson that Ford had been with the victim earlier that evening and close to the time that the shot was heard. Sometime after midnight, the police went to Ford's house on Newhall Street, where his mother, Sandra Streeter, answered the door and permitted the detectives to enter the house to question Ford.

dant, however, the police asked him to make a formal statement, which he did and which the police recorded by audio tape. After recording this inculpatory statement, the police drove Ford and his mother, Sandra Streeter, home.[32]

Ford made his second audiotaped statement to the police on October 12, 2001.[33] In this statement, Ford again identified a photograph of the defendant from a photographic array as depicting the man that he had seen running from the crime scene and added that he had seen the defendant carrying a black handgun. Ford's testimony at the defendant's first trial was consistent with these audiotaped statements. At that trial, when Ford was asked why he had not initially identified the defendant to the police and why he had not mentioned the gun in his first statement, he testified that he had withheld information because he was scared of the defendant and that "[he] would get out and try to kill [him]."

At the defendant's second trial, however, Ford recanted all of his prior inculpatory statements about the defendant and renewed his initial assertion that he never saw the defendant in the area of the crime scene or with a gun on October 10, 2001. Moreover, Ford testified that he felt pressured by the police when questioned and that his statements had been compelled. He testified that he felt like a suspect and was afraid that, if he did not give the police information, he would

---

[32] Ford's testimony at the second trial conflicted with respect to the periods of time when Streeter was not in Ford's company during the interrogation. Streeter testified that she was not aware, at the time, that Ford gave the police a recorded statement.

[33] The record reveals inconsistent testimony with respect to whether Ford initiated contact with the police on October 12, 2001, or whether the detectives came to his house and asked for additional information. It is clear, however, that Ford did give a second audiotaped statement at the police station on October 12 and that his father and Streeter accompanied him to the station on that day.

jeopardize his probationary status. Furthermore, although Ford admitted that he changed residences before the second trial because he felt afraid, while testifying, he affirmatively denied feeling scared of or threatened by the defendant.[34] All of Ford's prior inconsistent statements were admitted at trial not only to impeach him but also for their truth pursuant to § 8-5 (1) of the Connecticut Code of Evidence.[35]

Near the end of the trial, the defendant filed a motion to dismiss on the ground that the failure of the police to preserve evidence of the interrogation of Ford prior to his first audiotaped statement violated the defendant's right to a fair trial. Defense counsel argued at the hearing on the motion to dismiss that it is "important that there be some record made of any interview of any witness in a homicide case." The trial court observed that "we usually have the situation arise when . . . documents that existed at one time no longer exist either because they were destroyed or lost, whereas, here, we have a situation where the document that you are making reference to, that is, any notes regarding the 'preinterview,' never existed." Furthermore, the trial court agreed with the state's argument that "[t]he defense . . . adequately was able to cross-examine Detective Breland and . . . Ford regarding that. . . . [T]hey have completely explored the preinterview, the

---

[34] Ford testified at trial that, as a result of his probationary status, he had been living in a halfway house at the time of the first trial, where he felt protected and where visitors had to sign in and out.

[35] Section 8-5 of the 2000 edition of the Connecticut Code of Evidence, which was in effect at the time of the defendant's second trial, provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial:

"(1) Prior inconsistent statement. A prior inconsistent statement of a witness, provided (A) the statement is in writing, (B) the statement is signed by the witness, and (C) the witness has personal knowledge of the contents of the statement."

As the commentary to § 8-5 (1) indicates, tape-recorded statements are included within the exception.

violation, as they call it, of not preserving, and the jury has heard that." The trial court noted that "[t]he jury has heard testimony of both . . . Ford and . . . Breland. . . . [T]hey are going to be called on to make a determination as to really whether or not . . . Ford is telling the truth now, or was . . . telling the truth then, or was . . . telling the truth at the first trial . . . . And . . . that's what the jury's job is. And they have heard the testimony of everybody. It's certainly going to be open to you to argue to the jury that [it does not] have anything from . . . Breland. . . . I think that, certainly, you are entitled to argue to the jury that there was this preinterview concerning which no record, no notes, were made." The trial court ultimately denied the motion to dismiss and denied defense counsel's request for an adverse inference instruction.[36] The court did, however, instruct the jury that, in assessing the witnesses' credibility, including that of Breland, it could consider the defendant's argument that Breland deliberately omitted exculpatory information from his report.[37]

---

[36] We note that the trial court did not issue a separate memorandum of decision on its denial of this motion but, rather, signed a copy of the transcript of the hearing on the motion, which served as its memorandum. The defendant filed a motion for articulation, which was denied, and subsequently filed a motion for review of that denial with this court. We granted the motion for review but denied the relief requested therein.

[37] The trial court instructed the jury in relevant part: "Now, the defendant in this case claims that Detective Breland omitted certain information from his report. If you find that to be the case, you may consider that fact in assessing the overall credibility of . . . Breland's trial testimony.

\* \* \*

"Now, in this case . . . you heard testimony from [Ford, Breland and Streeter] that when . . . Ford was first questioned by the police during the early morning hours of October 11, 2001, he told them that he did not witness anything connected with the shooting of [the victim]. This evidence can be interpreted by you in several ways:

"First, you may consider that evidence for the truth of what it asserts, namely, that he never did witness any activities connected to the shooting on the evening of October 10, 2001.

"And, second, you may further consider . . . Ford's original information to police as evidence of a prior consistent statement.

\* \* \*

Generally, "[t]he decision whether to grant a motion to dismiss a criminal charge rests within the sound discretion of the trial court . . . and is one that we will not disturb on appeal absent a clear abuse of that discretion."[38] *State* v. *Kelly*, 256 Conn. 23, 77, 770 A.2d 908 (2001). We note, however, that the underlying determination as to whether the court correctly applied the law is a legal question that we review de novo. See, e.g., *Thompson* v. *Orcutt*, 257 Conn. 301, 308, 777 A.2d 670 (2001).

The defendant's claim is based on the proposition that the police had a duty under the federal and state constitutions to preserve evidence of the entirety of their interrogations of Ford.[39] Therefore, we begin by noting that it is well established that there are two areas of "constitutionally guaranteed access to evidence" such that denying or foreclosing the defendant's access to that evidence may constitute a due process violation. (Internal quotation marks omitted.) *State* v. *Morales*, 232 Conn. 707, 714, 657 A.2d 585 (1995); see also *Arizona* v. *Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). "The first situation concerns the

"Thus, in assessing whether to credit . . . Ford's trial testimony, you may consider the fact that the earliest information that he gave to the New Haven police department regarding this investigation, that he knew nothing about this incident, was consistent with what he testified to in court. Use of this prior consistent statement for this purpose is to rehabilitate the credibility of . . . Ford in light of the state's claim that his trial testimony is fabricated."

[38] The state noted in its brief that, in *State* v. *Welwood*, 258 Conn. 425, 433, 780 A.2d 924 (2001), we applied a de novo standard of review in determining whether a trial court's dismissal of criminal charges was proper. In *Welwood*, however, the grounds for dismissal related to the court's subject matter jurisdiction and not to the defendant's claim that he did not receive a fair trial. See id. Therefore, *Welwood* is inapposite to the present case.

[39] We note that evidence of these interrogations was presented at trial through the testimony of Ford, Breland and Streeter. Thus, the evidence that the defendant argues was not preserved is, as the defendant described at oral argument before this court, some form of "objective evidence" like notes or a recording of the entirety of the questioning.

*withholding of exculpatory evidence* by the police from the accused." (Emphasis in original.) *State* v. *Morales,* supra, 714. "The second situation . . . concerns the *failure of the police to preserve evidence that might be useful* to the accused." (Emphasis in original.) Id. It is this second situation that the defendant claims is applicable in the present case.

Despite these constitutional concerns, it is not sufficient under the federal or state constitution for a defendant simply to demonstrate that the police or the state has failed to preserve evidence. With respect to a due process violation for failure to preserve under the federal constitution, the United States Supreme Court has held that the due process clause of the fourteenth amendment requires that "a criminal defendant . . . show bad faith on the part of the police [for] failure to preserve potentially useful evidence [to] constitute a denial of due process of law." *Arizona* v. *Youngblood,* supra, 488 U.S. 58. Notably, in *Youngblood,* the court observed that it had adopted a higher burden for defendants seeking to demonstrate a due process violation for failure to preserve evidence than that applicable to claims that the state has suppressed or withheld exculpatory evidence in violation of *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (not requiring defendant to show bad faith to demonstrate due process violation). The court in *Youngblood* explained that it was unwilling "to read the 'fundamental fairness' requirement of the [d]ue [p]rocess [c]lause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (Citation omitted.) *Arizona* v. *Youngblood,* supra, 58.

In *Morales,* we rejected the federal bad faith requirement for claims alleging a failure to preserve in violation of our state constitution. Rather, we maintained that,

"in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the . . . balancing test [laid out in *State* v. *Asherman,* supra, 193 Conn. 724], weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the *missing* evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Emphasis added; internal quotation marks omitted.) *State* v. *Morales,* supra, 232 Conn. 726–27.[40]

To analyze the defendant's claims properly, we first must discuss the nature of the evidence with which the defendant is concerned. It is well settled that the state, including law enforcement, must disclose to a defendant any "statements" made by witnesses for the government. Practice Book § 40-13 (a) provides in relevant part: "Upon written request by the defendant . . . the prosecuting authority . . . shall . . . disclose . . . (1) Any statements of the witnesses in the possession of the prosecuting authority or his or her agents, including state and local law enforcement officers, which statements relate to the subject matter about which each witness will testify . . . ." Practice Book § 40-15 defines a "statement," for purposes of Practice Book § 40-13, as "(1) A written statement made by a person and signed or otherwise adopted or approved by such person"; or "(2) A stenographic, mechanical, electrical,

---

[40] We note that the parties' briefs included analyses of the application of the four part test from *Morales* to the facts of the present case. Because we conclude that the failure to create a record of the preinterviews with Ford did not constitute a failure to preserve exculpatory or potentially useful evidence, the four part test from *Morales* is not relevant, and we need not address these arguments.

or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." The defendant does not claim that the state withheld statements made by Ford or that the state failed to preserve the audiotaped statements that it created. Rather, the defendant claims that the investigating police officers had a duty to record the entirety of their interviews with Ford and that their failure to do so constituted a failure to preserve evidence within the meaning of *Morales* and *Youngblood*. We disagree.

Practice Book §§ 40-13 and 40-15 are modeled after the federal Jencks Act, 18 U.S.C. § 3500. See *State* v. *Cain*, 223 Conn. 731, 749, 753, 613 A.2d 804 (1992); *State* v. *Mullings*, 202 Conn. 1, 9 n.6, 519 A.2d 58 (1987). Although we have not been called on to resolve whether Practice Book §§ 40-13 and 40-15 impose an affirmative duty on the government to create a record of witness interviews, the federal courts have addressed this exact issue under the Jencks Act. Because of the parallels between our rules of practice and the Jencks Act, we deem it appropriate to look to federal court decisions for guidance. Cf. *State* v. *Morales*, supra, 232 Conn. 716.

Our research does not reveal a United States Supreme Court case on this issue, but many of the circuit courts of appeal have concluded that "[t]he Jencks Act does not impose an obligation on government agents to record witness interviews or to take notes during such interviews. . . . [T]he Act applies only to recordings, written statements, and notes that meet certain criteria, *not to items that never came into being . . . .*" (Emphasis added.) *United States* v. *Houlihan*, 92 F.3d 1271, 1288 (1st Cir. 1996), cert. denied, 519 U.S. 1118, 117 S. Ct. 963, 136 L. Ed. 2d 849 (1997); see also, e.g., *United States* v. *Lopez*, 112 Fed. Appx. 774, 776 (2d Cir. 2004) (Jencks Act clearly contemplates only preserva-

tion of notes or recorded statements and does not impose duty on government to create them); *United States* v. *Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986) (obligation to preserve recordings once made but no general duty to create recordings); *United States* v. *Flomenhoft*, 714 F.2d 708, 713 (7th Cir. 1983) (no duty to create Jencks Act material), cert. denied, 465 U.S. 1068, 104 S. Ct. 1420, 79 L. Ed. 2d 745 (1984). We agree with the sound reasoning of the federal courts that the purpose of the Jencks Act, and, by extension, our comparable rules of practice, is to ensure the *preservation* of notes or recorded statements once they are created. Neither the federal statute nor our rules of practice contain language establishing an affirmative duty to create records, as the defendant would have us acknowledge. Furthermore, *Morales* and *Youngblood* address the "preservation" of evidence, not the collection and creation of evidence. We conclude that the duty to preserve with which *Morales* and *Youngblood* are concerned depends on the government's possession of evidence capable of being preserved. Additionally, a review of our case law generally reveals nothing— nor have the parties directed our attention to any law— that would support the existence of an affirmative duty to create evidence or to record the entirety of communications with witnesses.

We also recognize that the adoption of such a rule would place a substantial burden on the administration of law enforcement and would amount to an unwarranted intrusion by the courts into the professional practices chosen by our trained law enforcement personnel. The First Circuit, in *United States* v. *Brimage*, 115 F.3d 73 (1st Cir.), cert. denied sub nom. *Ross* v. *United States*, 522 U.S. 924, 118 S. Ct. 321, 139 L. Ed. 2d 248 (1997), observed that "[t]here is a need by law enforcement personnel for considerable flexibility in how they go about their investigations, and courts

should not intrude into this area." Id., 76. In *Brimage*, the government elected not to create what the court described as "independent verification evidence" in the form of a recording and, instead, elected to rely on the testimony of witnesses at trial. Id. The court concluded that this decision was within the government's discretion and that "the decision not to record a conversation is categorically different from the failure by police to maintain [physical evidence]." Id. Furthermore, in *Campbell* v. *United States*, 296 F.2d 527 (1st Cir. 1961), the First Circuit also noted that "[t]he placing of new affirmative duties upon the [Federal Bureau of Investigation] would be entering a field for which [there is] no intimation in the legislative history, or justification in the statute." Id., 531–32; see also id., 531 (Jencks Act does not create affirmative duty to take notes during interview of witness). In a related analysis, we also have recognized the potential administrative and financial burdens on municipalities that would result from broadening our interpretation of "statement" in Practice Book § 40-13. See *State* v. *Cain*, supra, 223 Conn. 747–48, 752–53 (rejecting defendant's argument that government had duty to preserve all 911 call recordings as "statements"); see also *State* v. *Johnson*, 67 Conn. App. 299, 311, 786 A.2d 1269 (2001) ("same intolerable financial and administrative burdens" identified in *Cain* at issue in adopting duty to maintain recordings of police radio broadcasts), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). For the foregoing reasons, we conclude that the police do not have a duty to make a record of all interviews or interrogations with witnesses.[41] In the

---

[41] We agree with the First Circuit Court of Appeals in that, although we do not recognize a per se duty to create evidence of every witness interview, police and prosecutors should be wary of "adopting a 'what we don't create can't come back to haunt us' approach . . . ." *United States* v. *Houlihan*, supra, 92 F.3d 1289. In doing so, "prosecutors demean their primary mission: to see that justice is done. . . . By and large, the legitimate interests of law enforcement will be better served by using recording equipment and/or taking accurate notes than by playing hide-and-seek." Id.

present case, the defendant has not adequately alleged a failure to preserve exculpatory evidence, and, thus, *Youngblood* and *Morales* are not applicable to his claim. The trial court's denial of the defendant's motion to dismiss was not an abuse of discretion.

The defendant also claims that, if the trial court properly denied his motion to dismiss, it improperly declined his request for an adverse inference instruction regarding the unpreserved evidence of the preinterviews. Because we have concluded that the police had no duty to create a record of all interviews with Ford, we also conclude that the trial court properly declined the defendant's request for an adverse inference instruction. In *Morales*, we recognized that a possible remedy for failure to preserve exculpatory evidence short of dismissing the criminal charges against a defendant would be to charge the jury that they may draw an adverse inference from the failure to preserve. *State v. Morales*, supra, 232 Conn. 729, 730 n.25. Such an instruction permits the jury to infer from the failure to preserve that the evidence, if presented at trial, would have been unfavorable to the state. Id., 730 n.25. In the present case, such an instruction would have been improper because the state did not violate the defendant's due process rights, as a matter of law. Therefore, no need for the *Morales* remedies ever arose.[42]

---

[42] The defendant further argues that the court "exacerbated the harm of its refusal to give the adverse inference charge . . . when it charged that prior inconsistent statements can be used substantively when, as in this case, a witness has made a prior statement or testified to facts 'of which he has personal knowledge.' " The result of this, the defendant claims, is that, "since [the jury] did not hear the charge requested by the defense, and since it did hear that Ford's recanted version was admitted because of his personal knowledge, the jury credited the recanted story . . . and discredited the testimony at [the defendant's second] trial." We disagree. Viewing the trial court's instructions as a whole, as we are required to do in determining whether it is reasonably possible that the jury was misled; e.g., *State v. Jackson*, 283 Conn. 111, 117, 925 A.2d 1060 (2007); we find no merit to this argument. The trial court first instructed the jury on the evidence of prior *consistent* statements and specifically charged in the defendant's favor that:

## III

The defendant next claims that the trial court limited his cross-examination of Ford and thereby denied the defendant his rights to due process of law and to confront the witnesses against him, in violation of the state and federal constitutions. Specifically, the defendant relies on the trial court's failure to disclose Ford's psychological records and its refusal to permit defense counsel to cross-examine Ford about the nature of the felony charge that resulted in his youthful offender conviction. In response, the state contends that the defendant has waived any claim resulting from the trial court's failure to disclose Ford's psychological records and that the trial court's exclusion of evidence regarding the specific crime underlying Ford's youthful offender status was proper as a matter of law. We agree with the state and address each claim respectively.

### A

Prior to Ford's testimony, his juvenile court, juvenile probation and adult probation records were submitted to the court in response to the defendant's subpoena. The trial court reviewed the probation records and disclosed certain materials to counsel. The court noted, however, that Ford's juvenile probation records contained "some psychological or psychiatric-type records" dating back to April and June, 2000. The court refrained from reviewing those records because it concluded that doing so would invade another layer of

---

"[I]n assessing whether to credit . . . Ford's trial testimony, you may consider the fact that the earliest information that he gave . . . that he knew nothing about this incident, was consistent with what he testified to in court . . . . [I]f you believe that . . . Ford's initial claim to the police, that he did not witness anything connected to this investigation, was true, then you may use that evidence to decide, because that claim is consistent with his trial testimony, whether to credit his trial testimony." Only after instructing the jury on the use of prior consistent statements did the court then charge the jury as to how it could consider Ford's prior inconsistent statements.

privilege that required the defense to make a prelimi-
nary showing that there was some information helpful
to the defendant in those records. Defense counsel
agreed and called Ford to testify, without the jury pre-
sent, to attempt to establish that the records should
be disclosed. After questioning Ford, defense counsel
acknowledged that the defendant could not meet the
necessary showing to warrant disclosure of the privi-
leged records.[43] The court agreed, and defense counsel
withdrew the defendant's request that the court disclose
the records and did not request that the court conduct
an in camera inspection. In light of this withdrawal, the
defendant waived this claim.[44]

B

We next address the defendant's claim that the trial
court improperly declined to permit defense counsel
to cross-examine Ford regarding the underlying felony
charge that gave rise to Ford's youthful offender status.
We also conclude that this claim is groundless. Before
Ford took the witness stand, defense counsel sought
permission to question him about his conviction as a

---

[43] It is well established that, prior to disclosure of or an in camera inspec-
tion of privileged psychological records, the party seeking such disclosure
must demonstrate "a factual basis from which the trial court may conclude
that there is a reasonable ground to believe that the records will reveal that
at any pertinent time [the witness' psychological condition] affected his
testimonial capacity to a sufficient degree to warrant further inquiry." (Inter-
nal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 557, 747 A.2d
487 (2000).

[44] The defendant argues that, even if he failed to preserve this claim
properly, it is of constitutional magnitude because it implicates his right to
confront the witnesses against him and, therefore, is eligible for review
under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See
footnote 45 of this opinion. We disagree. Even if we assume without deciding
that the claim is of constitutional magnitude, the defendant's concession
that he could not make the requisite factual showing and his subsequent
withdrawal of the disclosure request constituted a waiver of any objection
to the trial court's failure to disclose. Such claims are not reviewable under
*Golding*. See, e.g., *State* v. *Fabricatore*, 281 Conn. 469, 478, 915 A.2d 872
(2007).

youthful offender. Specifically, defense counsel requested permission to mention the nature of the underlying charge, which was the felony-level crime of possession of narcotics with intent to sell. The trial court denied defense counsel's request on the ground that, although an adult convicted of the same crime might have a felony conviction that would be proper fodder for impeachment, Ford was a youthful offender, and, thus, his conviction was not a felony conviction. The court did permit defense counsel to question Ford about "the fact that [Ford was] on probation, the length of that probation, [and] the amount of time that he ha[d] hanging over his head . . . ." This area of cross-examination, the court observed, "would give the jury a sense as to the gravity of his situation so far as it may relate to any favorable treatment by the state in return for his testimony . . . ." In delivering its final charge to the jury, the court referenced Ford's criminal record and probation status, and instructed the jury that "our law allows the jury to consider whether . . . Ford's status as being on probation at the time of his original statement and at the time of his previous and current testimony could affect his credibility or believability."

In *State* v. *Keiser*, 196 Conn. 122, 491 A.2d 382 (1985), we concluded that when an individual has been granted youthful offender status, it is improper for the court to treat the underlying charges as "convictions" or to reference them as "convictions" during trial. (Internal quotation marks omitted.) Id., 128. In the present case, the nature of the crime underlying Ford's youthful offender adjudication did not constitute a felony conviction such that the specific crime was admissible for impeachment purposes. See Conn. Code Evid. § 6-7 (a), commentary. We conclude that the trial court properly permitted defense counsel to inquire about the fact of Ford's youthful offender probation to impeach his

credibility and properly excluded any inquiry into the nature of the underlying charge.

## IV

Finally, the defendant seeks reversal of his conviction on the grounds that the trial court improperly charged the jury on "consciousness of guilt" and inadequately charged the jury on the concept of reasonable doubt. The state contends that the trial court's charge was proper. We agree with the state.

We begin by noting that "[w]hen reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 559, 757 A.2d 482 (2000). With these general principles in mind, we address each of the defendant's claims pertaining to the court's charge in turn.

## A

The defendant first claims that the trial court improperly charged on "consciousness of guilt" because such a charge "put the court's imprimatur on the state's version of events. It was not evenhanded and made no mention of the defendant's innocent conduct . . . ." The defendant asserts that defense counsel's objection to the state's request to charge preserved this claim for appeal or, in the alternative, that the claim is reviewable

under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[45] In response, the state argues that the claim is not reviewable because the basis of defense counsel's objection differs from that raised at trial and because we have declined to view claims challenging consciousness of guilt instructions as constitutional in nature. We agree with the state.

The following additional facts and procedural history are relevant to this claim. In view of Ralph Ford's prior testimony that he had witnessed the defendant running from the direction of the crime scene carrying a gun, the state requested that the trial court instruct the jury that consciousness of guilt may be inferred from flight. Defense counsel objected, prior to the court's charge, on the ground that the instruction necessarily presumed that the defendant "was the person seen fleeing from the crime" and, thus, was prejudicial because it improperly influenced the issue of the shooter's identification in the state's favor. The trial court noted defense counsel's objection but decided to grant the state's request, and instructed the jury accordingly.[46] At the close of the

---

[45] In *Golding*, we held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

[46] The trial court instructed the jury in relevant part: "Now, I want to speak with you concerning a concept which we refer to as consciousness of guilt. In any criminal proceeding, in any criminal trial, it is permissible for the state to show that conduct by a defendant after the time of the alleged offense may fairly have been influenced by the criminal act, that is, the conduct would tend to show that the defendant was conscious of his own guilt, and his actions were in accordance with a guilty mind. Whatever you find proven in this regard must have been influenced by the criminal act and not by any other reason consistent with innocence.

"Now, the state claims that the defendant fled the scene of the alleged crimes. The conduct of a person leaving the scene of the crime may be

court's charge to the jury, neither counsel excepted to the instruction given on consciousness of guilt. On appeal, the defendant does not renew his argument that the consciousness of guilt instruction improperly presumed that he was the person seen fleeing from the direction of the shooting. Rather, he claims that the charge was not "evenhanded" because it "made no mention of the defendant's innocent conduct" at the dormitory at Southern Connecticut State University shortly after the shooting had occurred.

We have held that the specific grounds for an objection raised at trial are relevant to the preservation of a claim on appeal. See, e.g., *State* v. *Pinnock*, 220 Conn. 765, 796, 601 A.2d 521 (1992) (certain objections to "Chip Smith" charge were not preserved because bases for objections were not raised in exception taken before trial court); see also *State* v. *Melendez*, 74 Conn. App. 215, 229, 811 A.2d 261 (2002) (claim that consciousness of guilt instruction, as given, was inappropriate not reviewable when counsel objected only generally to charge and not to actual instruction after it was given), cert. denied, 262 Conn. 951, 817 A.2d 111 (2003). Accordingly, we have explained that, to afford petitioners on appeal an opportunity to raise different theories of

considered evidence of that defendant's consciousness of guilt. The flight of the person accused of a crime is a circumstance which, when considered together with all the facts, may justify an inference of the accused's guilt. Flight, however, if shown, is not conclusive. First, you must determine if the state has proven that the defendant was present at the scene of the alleged crime, and, if so, if you then find that the state has also proven such flight by the defendant was in connection with the alleged crimes, this does not raise a presumption of guilt. It is circumstantial evidence, and you may or may not infer consciousness of guilt from it. It is to be given the weight to which you think it is entitled under the circumstances shown.

"Let me make this clear to you. It is up to you, as judges of the facts, to decide whether the state has proven that the defendant fled the scene and, if so, whether or not whatever has been proven reflects a consciousness of guilt by the defendant, and to consider such in your deliberations in conformity with these instructions."

objection would "amount to ambush of the trial court" because, "[h]ad specific objections been made at trial, the court would have had the opportunity to alter [the charge]" or otherwise respond. *State* v. *Pinnock*, supra, 796. As we previously noted, the defendant in the present case does not renew the same theory of objection to the court's consciousness of guilt instruction on appeal that was raised at trial. Because his theory of objection has changed, we conclude that the claim is not reviewable. Furthermore, the claim also is not reviewable under *Golding* because we repeatedly have declined to consider challenges to instructions that allow for a *permissive* inference to be of constitutional magnitude. E.g., *State* v. *Luster*, 279 Conn. 414, 422, 902 A.2d 636 (2006); *State* v. *Alston*, 272 Conn. 432, 448, 862 A.2d 817 (2005).

B

The defendant's final claim is that the trial court improperly instructed the jury that reasonable doubt is a "doubt as in the serious affairs that concern you, you would heed," "such a doubt as would cause reasonable [people] to hesitate to act upon it in matters of importance," and "a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence." The defendant asserts that this instruction "diluted" the state's burden of proof. The state argues that the charge was proper. We agree with the state.

The following additional facts and procedural history pertain to this claim. In his request to charge, defense counsel objected to the use of certain language in the court's charge on reasonable doubt. Specifically, defense counsel requested that the court refrain from charging that (1) "reasonable doubt is a real doubt, an honest doubt,"[47] and that (2) "reasonable doubt is a

---

[47] Defense counsel claimed that such language suggests that the doubt must be a substantial doubt.

doubt that the jurors would pay heed to in the serious affairs of their own lives."[48] The court's ultimate charge included some of the language to which defense counsel had objected. Any such language that the court retained, however, was, as counsel acknowledged, language that previously has been upheld by this court.[49]

The defendant acknowledges in his brief that this court has rejected similar claims of instructional error.

[48] Defense counsel claimed, inter alia, that "[t]his language minimizes the seriousness of the task before the jury . . . and diminishes the prosecution's burden of proof."

[49] The trial court charged the jury in relevant part: "Now, the burden to prove the defendant guilty of the crime or crimes with which he is charged is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged.

"Whether the burden resting upon the state is sustained depends not on the number of witnesses nor on the quantity of the testimony but on the nature and quality of the testimony.

"Please bear in mind that one person's testimony, however, is sufficient to convict if you believe it beyond a reasonable doubt and if it establishes, either standing alone or together with any other testimony, all the elements of the crime beyond a reasonable doubt.

"Now, the meaning of 'reasonable doubt' can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess, or a mere conjecture. It is such a doubt as in the serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision.

"It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that, after hearing all the evidence, if there is something in the evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion.

"If you can in reason reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty."

E.g., *State* v. *Ferguson*, 260 Conn. 339, 371, 796 A.2d 1118 (2002); *State* v. *Velasco*, 253 Conn. 210, 249, 751 A.2d 800 (2000). Moreover, the defendant offers no rationale or argument why we should reconsider this line of cases. See *State* v. *Betances*, 265 Conn. 493, 511, 828 A.2d 1248 (2003). Therefore, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.