******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MAYCOL F. HERNANDEZ HERRERA
## (AC 47891)

Cradle, C. J., and Westbrook and Wilson, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the first degree, unlawful restraint in the second degree, and failure to appear in the first degree, the petitioner appealed to this court. During the trial, although a video recording and transcript of the victim's statement to the police were marked for identification only, they were included among the exhibits that were brought to the jury room prior to the jury beginning its deliberations. On appeal, the defendant claimed, inter alia, that the trial court improperly denied his motion to suppress certain statements that he made to the police following his arrest because the detective who interrogated him repeatedly made misrepresentations of fact that rendered his statements involuntary. *Held*:

The trial court did not abuse its discretion or violate the defendant's right to due process by denying his motion to suppress certain statements he made to the police, as this court, having reviewed the totality of the circumstances surrounding the defendant's interrogation, concluded that the factual misrepresentations and other deceptive tactics used by one of the police officers during the defendant's interview did not render his statements to the police involuntary and, thus, inadmissible as a matter of due process.

The trial court properly denied the defendant's motion for a mistrial based on the two exhibits marked for identification only that were inadvertently submitted to the jury during its deliberations, as the court properly exercised its discretion in conducting an inquiry into the potential issue of juror misconduct pursuant to *State* v. *Brown* (235 Conn. 502), and the defendant failed to demonstrate that his right to an impartial jury was violated.

Argued December 15, 2025—officially released June 16, 2026

*Procedural History*

Amended information charging the defendant with the crimes of sexual assault in the first degree, unlawful restraint in the second degree, and failure to appear in the first degree, brought to the Superior Court in the judicial district of Fairfield, where the court, *Richards, J.*, denied the defendant's motion to suppress certain statements; thereafter, the case was tried to the jury before *Richards, J.*; subsequently, the court denied the defendant's motion for a mistrial; verdict of guilty; thereafter, the court, *Richards, J.*, denied the defendant's motions for

a judgment of acquittal and for a new trial and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed*.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Nicholas Lee Scarlett*, deputy assistant state's attorney, with whom, on the brief, was *Joseph T. Corrandino*, state's attorney, for the appellee (state).

*Opinion*

WESTBROOK, J. The defendant, Maycol F. Hernandez Herrera, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and unlawful restraint in the second degree in violation of General Statutes § 53a-96 (a).[1] The defendant claims that the trial court improperly (1) denied his motion to suppress statements that he made to the police following his arrest because the detective who interrogated him repeatedly made misrepresentations of fact that rendered his statements involuntary, and (2) denied his motion for a mistrial in which he argued that certain exhibits marked for identification only were inadvertently submitted to the jury during deliberations. We reject the defendant's claims and affirm the judgment of the court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our review of the defendant's claims. In 2019, when the assault at issue occurred, the defendant was twenty-two years old and lived and worked in Pennsylvania. Two weekends per month, he travelled to Connecticut to visit his two sons, who lived with their mother. When he visited, he stayed at his mother's home in Bridgeport. His sister, M,[2] also resided at the Bridgeport home. On

---

[1] The defendant also was convicted of failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1). The defendant does not contest this conviction on appeal.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others

July 6, 2019, during one of the defendant's visits, M asked the defendant to drive her to and from a friend's fifteenth birthday party. The victim, K, who was a friend of M from high school, also attended the party. When the defendant went to the party to pick up M, he went inside, where he met K. The defendant asked K for her phone number, which she declined to give him, although M later gave K's phone number to the defendant. The defendant gave M, K, and two others a ride home from the party. Over the next few days, the defendant sent text messages to K in which he asked her how old she was, called her beautiful, and told her, "I like you a lot [baby]."

On July 13, 2019, M invited K to come over to her house. When K arrived at M's house around 2 p.m., she and M first socialized in the living room. M later went to her bedroom and subsequently invited K to join her. When K entered the bedroom, she saw the defendant lying on the bed with M sitting next to him. After a few minutes, M asked K to sit on the bed between her and the defendant. Once K sat down on the bed, the defendant told M to leave. When M asked the defendant why, he told her to "get out." M left the room and closed the bedroom door. Once M was gone, the defendant got on top of K. K attempted to get up but was unable to do so because the defendant was on top of her. The defendant also placed a hand over K's mouth. The defendant moved K's clothing aside and pulled his pants down. K told the defendant to stop, and he responded that "he was [going to] be the first and the last." The defendant then put his penis inside K's vagina. After the defendant got off K, she exited the bedroom and asked M to use the bathroom. In the bathroom, K observed that she was bleeding from her vagina and that there was blood on her underwear. After K exited the bathroom, M told her that she should leave the house because M's mother would be home soon

through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

and "she would think ill of [K]." K left the house and called a taxi to drive her home.

At home, K changed her clothes and put her underwear in a bag to prevent her mother from finding the bloodstained underwear. A few hours later, K went to a pharmacy and purchased an emergency contraceptive to prevent any possibility of pregnancy. Sometime later, K washed the underwear she was wearing at the time of the assault.

Because K was concerned about her family's immigration status and possible police involvement, she did not immediately disclose the assault to her family. The following day, however, K told friends in Guatemala about the assault. In December 2019, during a meeting with a paralegal at an immigration law firm, K disclosed the assault and told the paralegal that the assailant was her friend's brother. In January 2020, K also disclosed the assault to her high school therapist. The therapist called the police and K's mother. Two police officers came to the school to speak with K and, thereafter, initiated a criminal investigation. In addition to providing the police with a formal statement, K brought the underwear that she had been wearing at the time of the assault to the police. The police took photographs but did not have the underwear forensically tested.

In January 2021, the Bridgeport police arrested and charged the defendant with unlawfully restraining and sexually assaulting K and transported him to the Bridgeport police station. At the police station, the defendant read and signed a written waiver of his *Miranda* rights.[3] Detective Walberto Cotto, Jr., then conducted a video recorded interview of the defendant. Although the defendant primarily spoke Spanish, Cotto questioned the defendant in English with another officer, Sergeant Gil Valentin, present during the interview to translate into Spanish any questions that the defendant did not understand. Initially, the defendant denied knowing

---

[3]See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

K and indicated that he had seen her only briefly at his mother's house on one occasion. Cotto showed the defendant a photo of the underwear K had been wearing on the day of the assault and indicated that the police would be able to determine from the underwear whether she had sexual intercourse. In fact, the police already had decided not to test the underwear because K had washed it. The defendant then admitted that he had been in M's bedroom with M when she had called K to join them, but he claimed that he immediately left the bedroom when K entered. Cotto responded by falsely claiming that M had told the police that the defendant and K had been alone in the bedroom. The defendant then claimed that, when M left him and K alone in the bedroom, K had pushed him onto the bed and kissed him but "[n]othing happened." After Cotto, again, falsely suggested that K's underwear was being tested, the defendant admitted to having sexual intercourse with K and having put his hand on her face. The defendant's interview lasted for approximately fifty minutes.

Prior to trial, the defendant filed a motion to suppress his statements to the police on the ground that he had not knowingly and intelligently waived his *Miranda* rights prior to giving his statement. At a hearing on the motion, defense counsel further argued that the defendant's waiver and subsequent statements were the result of the coercive environment, which included Cotto and Valentin's close proximity to him during his interview and the confusing nature of Cotto's questioning him in English. In a ruling from the bench, the trial court, *Richards, J.*, denied the motion to suppress, finding that the state had met its burden of proving that the defendant had validly waived his *Miranda* rights. The court also rejected the defendant's contention that he had been confused during the interrogation, finding that "[t]his confusion . . . is not reflected in the video." In particular, the court found that Valentin had assisted Cotto during the interview "to avoid any misunderstanding on the part of [the defendant] regarding the waiver of his constitutional rights." The video recording of the

defendant's interview and an English transcription of the recording were later admitted as full exhibits at trial.

K was called by the state to testify at trial. K's prior consistent video recorded statement to the police and a transcript of that interview were premarked as exhibits 4A and 4B for identification purposes only. Although the video recording and transcript of K's statement to the police were never admitted into evidence as full exhibits, they were included among the exhibits that were brought to the jury room prior to the jury beginning its deliberations at approximately 2 p.m. on December 14, 2023. The jury stopped deliberating for the day about 5 p.m. The jury resumed deliberations the following day at approximately 10 a.m. At 10:47 a.m., the jury sent a note to the court that asked whether it was "supposed to have [K's] statement on 10/14/2020 (exhibit 4A) since [it] didn't see this previously." The court recalled the jury to the courtroom and instructed the jury that it should not have been provided with those exhibits and should not consider them in any way. After issuing its instruction, the court returned the jury to its deliberations. The court asked counsel if there was "[a]nything else" and whether there were "[a]ny exceptions." Defense counsel responded "[n]o" to both questions.

Following a recess, the court again recalled the jury to instruct it to send out a note answering the following questions: "Did you in any way consider or examine the contents of the aforementioned exhibits? If you did not, please note that in the note, sign it, and date it. If you did, please remember my instruction. And, I might have . . . some other questions for you if you did. But let's see if you examined it. And I'd like to have that as a note so we can make it part of [the] court record." The jury responded by note that "[w]e did not review either 4A or 4B—we were uncertain if we should have it from the get-go."

The court indicated on the record to counsel outside the presence of the jury that it was going to consider its inquiry and the jury's response sufficient to comport with

any obligation the court had under *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), to conduct an inquiry into potential juror misconduct. The court inquired of counsel: "Is there any issue regarding any other questioning that either party wishes to ask of the jury. We can bring them out and you can do that." Defense counsel responded: "No, Your Honor. I think the analysis that we've undergone is sufficient." The state agreed, and the court called the jury into the courtroom to inform the jurors that they had answered the court's question and could continue with their deliberations. After the jury exited, the court asked counsel if there was "[a]nything else," to which defense counsel responded, "No, Your Honor." The court took a recess.

Following the recess, however, defense counsel made an oral motion for a mistrial, arguing that the jurors must have looked at the exhibits in question because they were able to identify them as having been improperly presented to them. Counsel argued that, notwithstanding the jury's response to the court's questions, "the concern is . . . that it corrupted the jury and could affect the defendant's ability to have a fair and impartial verdict in this case." The state objected to the motion for mistrial. The court denied the motion in an oral ruling from the bench, concluding that a plain reading of the jury's written response to the court's inquiry indicated that it had not examined or considered exhibits 4A and 4B and that, therefore, its impartiality could not possibly have been affected.[4]

The next day, the court indicated that it wanted "to take the extra step of further questioning the jury

[4]The court's decision in full was as follows: "It's axiomatic that juror misconduct, and that's what we're allegedly talking about here, occurs whenever, amongst other criteria, essential criteria, which is before us today, is that juror misconduct occurred because the jury may have been exposed to inadmissible evidence in the jury room by error. And I looked at *State* v. *Johnson* [288 Conn. 236, 951 A.2d 1257 (2008)] in this regard . . . . It's axiomatic that the court must conduct an inquiry whenever it is presented with a misconduct allegation. Again, the court looked at *State* v. *Brown*, [supra, 235 Conn. 502]. Here, the court conducted an inquiry by calling the panel out, asking the jury foreperson

. . . whether anything regarding [exhibits 4A and 4B] or the process would affect their ability to be fair and impartial." The court asked the jury to respond in a note to the court. The jury subsequently confirmed by a written note that the incident with the exhibits "did not create any biases on the jury." Shortly thereafter, the jury returned a verdict finding the defendant guilty on all charges. The court accepted the verdict and later sentenced the defendant to a total effective sentence of twenty years of incarceration, execution suspended after fourteen years, followed by ten years of probation. This appeal followed.

I

The defendant first claims that the court abused its discretion and violated his right to due process by denying his motion to suppress his statements to the police because the police officers who conducted his interview lied to him with respect to statements purportedly made by M and about potentially incriminating evidence obtained from K's underwear. The state responds that the defendant's claim is unpreserved because he never raised these arguments in his motion to suppress, which was limited to whether he had knowingly and voluntarily waived his *Miranda* rights. The state argues that the

to answer the question of the court by way of a note . . . whether they had in any way examined the contents of those exhibits. . . . The court recessed for a length of time. The jury knocked on the door, indicated that they had a note. The note, which was signed and dated . . . at 11:1[8] a.m. indicated we did not review either 4A or 4B, we were uncertain if we should have it from the get-go. So, it is obvious—I don't know whether it's obvious, but from, I think, a plain reading of the note is they didn't review it. So, the next question of the court is that would it have affected your ability to be fair and impartial is somewhat moot because they didn't review the information that the court would have to inquire about. So, in light of those factors, I don't feel that there was grounds sufficient to grant the mistrial. I feel that the court conducted the inquir[y] under *Brown* and *Johnson* as required under Connecticut case law. The jury was questioned, I think, in a manner that it answered the court's question in a concise manner. They had not examined any of the documents. They were bringing them to the court's attention simply by noting that they did not know whether they had to have them or not. In light of those factors, your motion for mistrial is denied."

trial court never made any factual findings regarding the circumstances surrounding the voluntariness of his statements to the police, and, therefore, we should decline to review his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), because the record is inadequate for review. The state further argues that, even if the record is adequate for review, the defendant has not established a violation of his constitutional rights. Although we conclude that the record is adequate to review the defendant's unpreserved claim and his claim is of constitutional magnitude, we agree with the state that, on the basis of that record, the defendant has failed to demonstrate a violation of his constitutional rights with respect to the voluntariness of his statements to the police. We accordingly reject the defendant's claim to the contrary.

We begin with our standard of review and governing legal principles. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is . . . it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, whether a confession is voluntary must be grounded [in] a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation

of food and sleep. . . . Under the federal constitution, however, coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . .

"It is well settled that [t]he state bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence. . . . [As for the scope of our review] we note the established rule that [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . .

"[A]lthough we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . . [A]pplying the proper scope of review to the ultimate issue of voluntariness requires us . . . to conduct a plenary review of the record in order to make an independent determination of voluntariness." (Internal quotation marks omitted.) *State* v. *Griffin*, 339 Conn. 631, 667–69, 262 A.3d 44 (2021), cert. denied,       U.S.       , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).[5]

On several occasions, our Supreme Court has addressed how the use of so-called "false evidence ploys," in which interrogators reference evidence that they do not have "to give the impression that their case against the defendant [is] stronger than it actually [is]," could impact the voluntariness of a confession. Id., 673–74. For example, in *State* v. *Lapointe*, 237 Conn. 694, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), our Supreme Court rejected a claim that a

---

[5]As the defendant recognizes in his appellate brief, our Supreme Court in *Griffin* declined to set a higher standard under the Connecticut constitution regarding review of the voluntariness of a confession or incriminating statement to law enforcement. See *State* v. *Griffin*, supra, 339 Conn. 691.

defendant's incriminating statement was rendered involuntary because the police falsely represented to him that it found his fingerprints on the handle of the knife used to murder the victim. Id., 731–32. The court in *Lapointe* reasoned that "[s]uch statements by the police designed to lead a suspect to believe that the case against him is strong are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." Id., 732.

Our Supreme Court had an opportunity to revisit this language from *LaPointe* in *State* v. *Griffin*, supra, 339 Conn. 631, explaining as follows: "Although we do not interpret *Lapointe* as suggesting that false evidence claims can never contribute to the involuntariness of a confession, we take this opportunity to emphasize that misrepresentations by interrogating officers about the strength of their case against a defendant can, under certain circumstances, add to the coercive nature of an interrogation. We decline at this time, however, to categorically condemn the use of such tactics or to adopt any bright-line rules as to their likely impact on the voluntariness of a confession." Id., 674. The court in *Griffin* indicated that "[t]he impact of false evidence ploys, if any, must . . . be assessed in light of the totality of the circumstances, including the presence or absence of other coercive circumstances and the personal characteristics of the defendant."[6] Id., 675.

Turning to the defendant's claim, we first address the issue of preservation raised by the state. It is axiomatic

[6]Although not directly applicable to the defendant's 2021 interrogation, we note that the legislature passed legislation, effective October 1, 2023, concerning law enforcement's use of deception or coercive interrogation tactics. See Public Acts 2023, No. 23-27, § 1; see also General Statutes § 54-86q. Subsection (a) of § 54-86q defines what constitutes " 'deception or coercive tactics,' " and the statute imposes a rebuttable presumption that "any admission, confession or statement, whether written or oral, made by any person during a custodial interrogation by a law enforcement agency official or such official's agent" is involuntary and inadmissible in any proceeding if "deception or coercive tactics" were used during the interrogation. General Statutes § 54-86q

that an appellate court "shall not be bound to consider a claim unless it was distinctly raised" before the trial court. Practice Book § 60-5; see also *State* v. *Hampton*, 293 Conn. 435, 443, 988 A.2d 167 (2009) (concluding that claim on appeal regarding motion to suppress was not preserved because claim was not distinctly raised in motion to suppress or during suppression hearing). "The requirement that the claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked." (Emphasis in original; internal quotation marks omitted.) *State* v. *Carter*, 198 Conn. 386, 396, 503 A.2d 576 (1986). In other words, it must "alert the trial court to the *specific* deficiency now claimed on appeal." (Emphasis added.) Id. "Requiring a party to distinctly raise a claim of error before the trial court is no mere formality; rather, it ensures that the trial court is specifically apprised of the alleged error and, thus, has an opportunity to respond accordingly." (Internal quotation marks omitted.) *State* v. *Danielle P.*, 238 Conn. App. 73, 93–94, 335 A.3d 69 (2026).

On the basis of our review of the motion to suppress and the arguments made to the court during the hearing on that motion, we agree with the state that the defendant failed to preserve his claim that Cotto's use of false evidence ploys during his interrogation of the defendant was so egregious that, under the totality

---

(c). Significantly, and consistent with *Griffin*, the use of false evidence ploys is not among the tactics deemed to be *presumptively* deceptive or coercive provided that the person subject to interrogation is, like the defendant in the present case, over the age of eighteen at the time of the interrogation.

Subsection (b) of § 54-86q expands what constitutes " 'deception or coercive tactics' " if the person being interrogated is under eighteen years of age to include any tactic that "(1) Communicates false facts about evidence that were known to the law enforcement agency official or their agent or should have been known to the law enforcement agency official or their agent to be false; (2) Communicates false statements or misrepresentations of the law that were known or should have been known to be false statements or misrepresentations; or (3) Communicates false or misleading promises of leniency or some other benefit or reward that were known or should have been known to be false or misleading."

of the circumstances, they contributed to an unfairly coercive interrogation that rendered the defendant's inculpatory statements to the police involuntary. The written motion to suppress claimed that his statements to the police were "the fruits of an unlawful, warrantless search and/or seizure of the defendant's person and/or effects"; "obtained . . . without knowing and intelligent waiver of [his *Miranda*] right[s]"; or "obtained through violation of the defendant's sixth amendment right to assistance of counsel . . . ." The written motion did not challenge the voluntariness of the defendant's statements on the ground that they were the result of coercive or deceptive interrogation tactics. The court indicated in its decision on the motion to suppress that it understood the sole issue before it to be "whether the defendant waived his *Miranda* rights regarding his statement." Defense counsel did ask questions during the suppression hearing relative to the atmosphere of the interrogation, including whether the close proximity of the detectives to the defendant may have been intimidating, or whether language barriers may have resulted in confusion. Although defense counsel asked Cotto if it was a generally accepted police practice to give individuals subject to interrogation false information, counsel never established whether the defendant was provided with false information or argued that Cotto's use of false information was a factor to be considered in evaluating the voluntariness of the defendant's statements. In short, the defendant failed to preserve the precise, specific claim he now raises on appeal.

To the extent that his claim is unpreserved, the defendant nevertheless seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: **(1)** the record is adequate to review the alleged claim of error; **(2)** the claim is of constitutional magnitude alleging the violation of a fundamental right; **(3)** the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and **(4)** if

subject to harmless error analysis, the state has failed to demonstrate [the] harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two prongs govern whether we may review the claim, [whereas] the second two control whether the defendant may prevail on his claim because there was constitutional error that requires a new trial. . . . In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Johnson*, 354 Conn. 96, 104–105, 349 A.3d 260 (2026). We conclude that the defendant has failed to establish that Cotto's use of deceptive tactics during the defendant's interrogation, including misrepresenting certain facts, rendered his statements involuntary. Accordingly, his claim fails under the third prong of *Golding*.[7]

We conclude, consistent with the analysis set forth by the state in its appellate brief, that, in light of the

[7]The state argues that the record is inadequate for review and that we should conclude that the defendant's claim fails under the first prong of *Golding*. We agree with the state that the defendant's failure to raise the precise arguments that he now raises on appeal necessarily affects the quality of the record available for review. For example, the defendant argues on appeal that the trial court "did not address whether the detectives' lies affected the voluntariness of the confession," did not acknowledge our Supreme Court's discussion in *Griffin* regarding deceptive interrogation tactics, and did not evaluate several factors that our courts previously have deemed relevant to an inquiry about the voluntariness of a confession. Such lapses, however, are directly attributable to the fact that the arguments the defendant now raises on appeal were not made to the trial court. At trial, however, it was established that Cotto misrepresented certain facts to the defendant during the interrogation. See *State* v. *Whitaker*, 215 Conn. 739, 742, 578 A.2d 1031 (1990) (in conducting review of decision on motion to suppress, appellate courts are not limited to evidence presented to trial court at suppression hearing). Moreover, the defendant's interview was video recorded and transcribed, and both are part of the record on appeal. "The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to

totality of the circumstances, Cotto's two factual mis-representations during the defendant's interview with the police did not render his incriminating statements involuntary and, thus, inadmissible as a matter of due process. As previously stated, in considering whether a statement has been given voluntarily, it is appropriate to consider the totality of the circumstances involved including "the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Internal quotation marks omitted.) *State* v. *Griffin*, supra, 339 Conn. 668.

In denying the motion to suppress, the trial court expressly found that the defendant was advised of his constitutional rights consistent with *Miranda* and made a valid waiver of those rights prior to his questioning by the police. The defendant does not challenge those findings on appeal. "The provision of adequate *Miranda* warnings is significant in our analysis because it has a bearing on both sides of the voluntariness calculus: It bears on the coerciveness of the circumstances, for it reveals that the police were aware of the suspect's rights and presumably prepared to honor them. And . . . it bears [on] the defendant's susceptibility, for it shows that the defendant was aware he had a right not to talk to the police." (Internal quotation marks omitted.) Id., 671–72. As the United States Supreme Court has noted: "We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent

---

whether a constitutional violation has occurred, *we will not attempt to supplement or reconstruct the record, or to make factual determinations*, in order to decide the defendant's claim." (Emphasis added.) *State* v. *Golding*, supra, 213 Conn. 240. Although it would have been less burdensome for this court if the trial court had made relevant findings with respect to the precise issue before us, we nonetheless conclude that it is possible to evaluate on the existing record as a whole what potential effect, if any, Cotto's misrepresentations and other tactics had on the defendant and whether those tactics reasonably could have overborn the defendant's will.

confession. But cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer* v. *McCarty*, 468 U.S. 420, 433 n.20, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Prior to his interview, the defendant in the present case was provided with a *Miranda* waiver form, he read his rights out loud, and he indicated that he understood those rights by writing his initial after each of his rights and signing the waiver forms.

Next, the state argues that "the circumstances surrounding the police interview, including the length of the interview, the defendant's demeanor during his interview, and the lucidity of his statements to the police further support that the defendant's confession was voluntary." First, the interrogation lasted approximately fifty minutes, which is far shorter in length than interrogations that our Supreme Court previously has determined were not inherently coercive in length. See, e.g., *State* v. *Griffin*, supra, 339 Conn. 682 (collecting cases and holding that three hour interrogation at issue was "far shorter than other interrogations held not to have been inherently coercive"). Second, the trial court found, on the basis of its review of the video recorded interview, that "the defendant shows that he is lucid and not under the influence of any intoxicating substances when he asked [Cotto] at the end of the interview . . . the date of the interview and, after [Cotto] responds, the defendant writes down the correct date and time."[8] As our Supreme Court in *Griffin* reinforced, "[i]t is undisputed . . . that [a] defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary." (Internal quotation marks omitted.) *State* v.

[8]In its decision, the court expressly found that Cotto's testimony at the suppression hearing was credible and supported by the evidence. Specifically, the court credited Cotto's assessment that, at the time of the interview, the defendant was not under the influence of drugs or alcohol, his speech was clear and lucid, and his answers were related to Cotto's questions.

*Griffin*, supra, 683. Our review of the video recording confirms that the defendant appeared lucid and maintained a calm demeanor during his interview, and his answers related to the detective's questions. Third, as the defendant concedes, no evidence was presented that the police subjected him to any physical punishment either before or during the interview.

The only allegedly coercive behavior that the defendant articulated before the trial court was that Cotto and Valentin sometimes would invade his personal space by moving closer to him when he denied their allegations. On appeal, he argues that this close proximity made him "afraid that he might be beaten if he didn't falsely admit guilt." On the basis of its review of the video recording of the interrogation, however, the trial court rejected the defendant's argument that the detectives' proximity to him was itself coercive in nature, and we are not convinced otherwise. The defendant does not challenge this aspect of the court's ruling in the present appeal, arguing only that the court did not make additional express findings regarding the effect of the police officers' use of misinformation, the defendant's education or intelligence, or his lack of prior experience with police questioning.

We also agree with the state that, on balance, the defendant's personal characteristics also support that his confession was voluntary. Specifically, the defendant was an adult, he had a tenth grade education, and he was gainfully employed. Although the defendant argues that his lack of experience with the police impacted the voluntariness of his confession, as we have already concluded, the police adequately informed the defendant of his rights and he indicated that he understood those rights and validly waived them prior to questioning. We are simply not convinced by the defendant's arguments that his education, intelligence, or lack of prior experience with law enforcement played any role in creating the type of unreasonably coercive atmosphere that would

have overborn his will such that his statements should be viewed as involuntary.

Finally, the defendant heavily relies on the concurring opinion in *Griffin* to support his argument that the factual misrepresentations Cotto made during his interview were so egregious that they rendered his confession involuntary. The concurring opinion, however, agreed with the majority that "courts generally have not deemed [false evidence ploys], in and of itself, sufficient to render a confession involuntary." (Emphasis omitted.) *State* v. *Griffin*, supra, 339 Conn. 707 (*Ecker, J.*, concurring in part and dissenting in part). Because, as we have discussed, other inherently coercive elements were not present in this interview, the relatively few instances of Cotto's use of false evidence ploys during the defendant's interview were simply insufficient to render the defendant's confession involuntary. At trial, the defendant testified that he was aware of at least one of the false evidence ploys used by the police during his interview. Such knowledge obviously would have reduced the overall alleged coercive impact of Cotto's deceptive tactics. See *State* v. *Doyle*, 104 Conn. App. 4, 18, 931 A.2d 393 (defendant's testimony at trial that "he did not believe the statements by the police" regarding false evidence ploy "clearly demonstrate that the defendant's will was not overborne"), cert. denied, 284 Conn. 935, 935 A.2d 152 (2007).

Having reviewed the totality of the circumstances surrounding the defendant's interrogation, we conclude that the factual misrepresentations and other deceptive tactics used by Cotto during the defendant's interview did not render his statements to the police involuntary. Because the defendant has failed to show a constitutional violation of his due process rights, his unpreserved claim fails under the third prong of *Golding*.

II

The defendant also claims that the court improperly denied his motion for a mistrial in which he argued that

certain exhibits that had been marked for identification only were inadvertently submitted to the jury during its deliberations. We reject the defendant's claim.

We begin with general legal principles, including our standard of review. "While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. . . . The trial court enjoys wide discretion in deciding whether a mistrial is warranted . . . and its evaluation as to events occurring before the jury is to be accorded the highest deference. . . . Every reasonable presumption will be given in favor of the trial court's ruling . . . because the trial court, which has a firsthand impression of the jury, is in the best position to evaluate the critical question of whether the juror's or jurors' exposure has prejudiced a defendant. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion. . . . A reviewing court gives great weight to curative instructions in assessing error." (Internal quotation marks omitted.) *State* v. *Rivera*, 152 Conn. App. 248, 254–55, 96 A.3d 1285, cert. denied, 314 Conn. 934, 102 A.3d 85 (2014).

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, §8, and by the sixth amendment to the United States [c]onstitution. . . . [T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . A necessary component of the right to an impartial jury is the right to have the jury decide the case solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court. . . . *Consideration of extrinsic evidence is jury*

*misconduct and has been found to be sufficient to violate the constitutional right to trial by an impartial jury.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Kamel*, 115 Conn. App. 338, 343, 972 A.2d 780 (2009).

A jury's consideration of evidence that the court has not fully admitted as an exhibit, such as evidence marked for identification purposes only, constitutes the consideration of extrinsic evidence for the purposes of the defendant's constitutional rights under the sixth amendment and, therefore, is treated as jury misconduct. See id., 345; see also *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 103–104, 956 A.2d 1145 (2008).

As our Supreme Court explained in *State* v. *Santiago*, 245 Conn. 301, 715 A.2d 1 (1998), appellate review "of the scope of the trial court's preliminary inquiry into allegations of jury misconduct is governed by *State* v. *Brown*, supra, 235 Conn. 502. In *Brown*, [our Supreme Court] exercised [its] supervisory authority over the administration of justice to hold that . . . a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. . . . [T]he trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct . . . [and] [i]n exercising that discretion, the trial court must zealously protect the rights of the accused. . . . [The role of] an appellate court is limited . . . to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . [T]he trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations

of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. . . . [A]ny assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury misconduct will necessarily be fact specific. . . . The circumstances in each case will necessarily vary and each situation is sui generis." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, supra, 331. With these principles in mind, we turn to the present case.

As a preliminary matter, we address the state's argument that we should decline to review the defendant's claim because he waived his right to challenge the alleged jury misconduct because he failed to raise an objection before the trial court regarding its inquiry into the alleged jury misconduct. Although the state is correct that defense counsel initially voiced no objections to the inquiry and corrective actions taken by the trial court in response to the jury's note about the exhibits and indicated on the record that he did not have any additional questions for the jurors, defense counsel returned following a recess and orally moved for a mistrial. By so doing, he not only preserved the arguments now raised on appeal; see *State* v. *Colon*, 272 Conn. 106, 363 n.146, 864 A.2d 666 (2004) (claim was adequately preserved because it was raised in motion for mistrial), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); but effectively revoked any prior express or implied waiver of the defendant's right to challenge the court's handling of possible jury misconduct. We take note that the trial court, in denying the motion for a mistrial, rejected the defendant's arguments on their merits and not on the basis of any perceived waiver. See footnote 4 of this opinion. Accordingly, we reject the state's invitation to decline review of the defendant's claim on the basis of waiver. We do, however, agree with the state's alternative argument that, even if not waived, the defendant's claim fails because the court properly exercised its discretion in conducting its inquiry into the potential juror

misconduct issue and concluding that misconduct did not infringe upon the defendant's right to an impartial jury.

This court previously has considered whether a court abused its discretion by refusing to grant a mistrial on the ground that exhibits not entered into evidence as full exhibits were submitted to the jury for review during its deliberations. See *State* v. *Stuart*, 113 Conn. App. 541, 544, 967 A.2d 532, cert. denied, 293 Conn. 922, 980 A.2d 914 (2009). Like in the present case, amongst the exhibits provided to the jury in *Stuart* were several exhibits that had been marked for identification only. Id., 548. The court learned of the error on the second day of deliberations. Id. Unlike in the present case, when the court inquired of the jury whether it had reviewed the improperly submitted materials, the jury indicated that it had. Id., 549. The court then instructed the jury to disregard any of the information in the exhibits. Id. The defendant moved for a mistrial, but the court denied the motion on the ground that any error was harmless. Id.

On appeal, this court in *Stuart* concluded that the submission of the exhibits did not constitute structural error and did not violate the defendant's right to an impartial jury. Id., 552–55. The court explained that "[t]he admission of exhibits not properly admitted into evidence is trial error, which may be subject to harmless error analysis, and is not structural error because it is not an error that fundamentally infects the entire trial process and defies analysis of its specific impact. It may be quantitatively assessed in the context of the evidence." Id., 551. Furthermore, the court concluded that the trial court had not abused its discretion in denying a mistrial, reiterating that our "[c]ase law recognizes that the trial judge is in the superior position to gauge the extent and effect of any improper viewing" of extrinsic evidence, and observing that the trial court was fully aware of the contents of the exhibits at issue as well as their significance to the overall evidence and had instructed the jury to disregard its viewing of those exhibits. Id., 553–54. The court in *Stuart* held that the circumstances "did

not compel a mistrial"; id., 554; and we are unconvinced that the circumstances of the present case compel a different result.

In the present case, when the court learned of the error, it exercised its discretion consistent with the holding in *Brown* by conducting a limited inquiry of the jury and giving a curative instruction. See *State* v. *Brown*, supra, 235 Conn. 526; *State* v. *Stuart*, supra, 113 Conn. App. 555. The defendant argues that the court abused its discretion in conducting its inquiry because it did not adequately question the jurors about the circumstances surrounding the jury's discovery of the erroneously submitted exhibits, instructed the jury not to consider the exhibits before it asked whether the jury had examined the contents of the exhibits, and relied on the jury's note that indicated it had not reviewed the exhibits rather than asking the jury to respond to that question on the record. We reject the defendant's arguments that the court's procedures were insufficient under *Brown*.

It was unnecessary for the court to have inquired more about what triggered the jury's initial note regarding exhibits 4A and 4B because the jury's reasoning was apparent from a common sense reading of the note. In particular, in its note, the jury asked whether it properly had been provided the exhibits because it "didn't see [these exhibits] previously" at trial. We agree with the state that making any further inquiry into what prompted the jury to send its note risked improperly invading the mental processes of the jurors. See, e.*g.*, *State* v. *Johnson*, 288 Conn. 236, 264, 951 A.2d 1257 (2008) (concluding that court's inquiry into juror misconduct pursuant to *Brown* "improperly invaded the mental processes of the jurors"). Additionally, there is no merit to the defendant's suggestion that the court abused its discretion simply because it instructed the jurors to disregard any information in the exhibits before confirming whether or not they had reviewed them. We see no significance in the particular order in which the court conducted its inquiry into the potential juror

misconduct. In *Stuart,* the court similarly had instructed the jury not to consider any of the information contained in the improper exhibits before asking whether the jury had viewed those exhibits. See *State* v. *Stuart*, supra, 113 Conn. App. 554. On review, this court concluded that the trial court's *Brown* inquiry was a proper exercise of discretion. Id. The order in which the trial court elected to conduct its inquiry in the present case similarly was well within the court's discretion. Finally, the court asked the jury in open court whether it "in any way consider[ed] or examine[d] the contents of the aforementioned exhibits." The jury responded unequivocally by note, as instructed,[9] that it "did not review either 4A or 4B . . . ." Contrary to the defendant's argument, it was not an abuse of the court's discretion to have accepted the jury's answer without asking it to clarify what it meant by "review." As the term is commonly understood, to "review" something means more than simply observing what something is but "[c]onsideration, inspection, or reexamination of a subject or thing." Black's Law Dictionary (9th Ed. 2009) p. 1434. The court concluded that "a plain reading of the note is they didn't review [the exhibits]." The jury's response was not ambiguous, but rather clearly reflected that, although it may have been vaguely aware of what

[9]We find no merit in the defendant's suggestion that the trial court's use of written notes rather than direct questioning of the foreperson or the jurors individually was an abuse of its discretion. Our Supreme Court in *Brown* stated unequivocally that "[o]ur requirement that any allegations of jury misconduct necessitate some type of a preliminary inquiry still leaves *the form and scope of such an inquiry to be determined by the trial court within the exercise of its discretion.*" (Emphasis added.) *State* v. *Brown*, supra, 235 Conn. 529. In the present case, the trial court explained on the record that it wanted to use written notes in order to ensure all communications were made a part of the court record. The defendant has not provided any persuasive legal authority that this choice constitutes an abuse of the requirement that the court conduct its preliminary inquiry under *Brown* "on the record." Id., 526; see *State* v. *Kamel*, supra, 115 Conn. App. 348; see also *State* v. *Montanez*, 185 Conn. App. 589, 607–608, 197 A.3d 959 (2018) (in conducting *Brown* inquiry to determine whether jury remained fair and impartial, court was not obligated to voir dire all jurors individually), cert. denied, 332 Conn. 907, 209 A.3d 643 (2019).

the exhibits contained, it had not examined or inspected the contents of those exhibits.

In summary, having learned of potential jury misconduct arising from viewing what amounted to extrinsic evidence, the court properly exercised its discretion in a manner consistent with *Brown* by conducting a limited inquiry on the record and providing an adequate curative instruction.

Moreover, the defendant has not persuaded us that the court abused its discretion in denying the motion for a mistrial. The defendant argues that the court erroneously concluded that there were insufficient grounds to grant the motion because the jury had not examined the exhibits marked for identification only. The defendant argues that "[n]either the video nor the transcript was . . . harmless given the credibility contest at the heart of this case." In making this argument, however, the defendant presumes that the jury reviewed the video recording and transcript of K's statement to the police. As we have explained, this presumption is contrary to the jury's unambiguous representations to the court, made following an adequate inquiry under *Brown*, on which the court expressly relied.

Because we are persuaded that the court properly exercised its discretion in conducting its *Brown* inquiry into the potential issue of juror misconduct and that the defendant has not demonstrated that his right to an impartial jury was violated in the present case, we conclude that the trial court properly denied his motion for a mistrial.

The judgment is affirmed.

In this opinion the other judges concurred.